**Tammie S. GILPIN, by and through her next friend and natural guardian, William M. Gilpin, Plaintiff,**

**v.**

**The KANSAS STATE HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., et al., Defendants.**

**Civ. A. No. W–5366.**

United States District Court,
D. Kansas.

Nov. 30, 1973.

Supplemental Order May 22, 1974.

Rodney H. Busey, Arvin, Arvin & Busey, Wichita, Kan., for plaintiff.

Ward, Martin, Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., for KSHSAA.

Robert C. Foulston, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Bo. Ed., Dr. Fred Addis, Leon Cannady.

## MEMORANDUM DECISION AND ORDER

THEIS, District Judge.

On August 20, 1973, the Board of Education of Unified School District # 259 adopted a policy permitting mixed competition in certain non-contact sports, one of which was cross-country. Pursuant to this policy, Tammie S. Gilpin, a junior at Wichita High School Southeast, Wichita, Kansas, requested and was granted permission to participate on the school's otherwise all male cross-country team. Immediately prior to her team's first interscholastic meet, however, Tammie was informed that her participation was prohibited by a rule of the Kansas State High School Activities Association enunciated in its 1973–74 Official Handbook, providing that:

"Boys and girls shall not be members of the same athletic teams in interscholastic contests."

The plaintiff thereafter filed this action, seeking preliminary and permanent injunctive relief based upon the alleged violation of her constitutional right to equal protection of the laws guaranteed by the Fourteenth Amendment. Jurisdiction is predicated on 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

On September 20, 1973, the Court issued a temporary restraining order enjoining the defendants from directly or indirectly interfering with plaintiff's continued participation on her high school's cross-country team in interscholastic meets pending a hearing on the merits of her claim. A hearing on the merits was subsequently held, and this case is now ripe for final resolution. Accordingly, the Court makes the following findings and orders.

The salient facts are relatively simple and are essentially not in dispute. Tammie Gilpin, a female junior in good academic standing at Southeast High School, Wichita, Kansas, enjoys long distance running and has a particularly keen desire to participate in interscholastic cross-country competition on her school team. As part of its interscholastic athletic program, Southeast High School provides for a cross-country team which has traditionally consisted solely of males, but it does not provide a separate cross-country running program for females. Since the Wichita Board of Education had promulgated a policy sanctioning mixed competition in non-contact sports, such as cross-country, Tammie sought and was granted permission from the Southeast High School cross-country coach to participate on the boys' team. Although Tammie quickly proved herself physically capable of competing with the boys on her team, she was not permitted to engage in interscholastic competition.

Tammie was informed by the school authorities that she could not participate on the boys' team because of a rule of the Kansas State High School Activities Association prohibiting participation by girls on boys' interscholastic athletic teams. Thus, although the Southeast High School authorities did not object to Tammie's participation on the cross-country team per se, she was not permitted to compete for fear that a violation of the Association's rules would result in the imposition of a penalty or sanction against the high school's athletic program. Tammie has, however, since been certified for future competition by the school authorities, dependent only upon the final outcome of this litigation. Accordingly, neither the Wichita School Board nor the Southeast High School authorities presently maintain a position adverse to that of the plaintiff.

It is clear that the sole reason preventing the plaintiff's participation in interscholastic cross-country competition is her sex. She contends that the Kansas State High School Activities Association's rule prohibiting mixed interscholastic competition constitutes an unlawful discrimination based on sex, and that it violates her constitutional rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983. Her complaint accordingly requests injunctive relief enjoining the defendants from enforcing the Association's rule or any re-

lated rule that would prevent her participation in interscholastic cross-country events and damages.

■ The Court has jurisdiction over this cause of action by virtue of 42 U.S. C. § 1983 and 28 U.S.C. § 1343(3). There are two essential elements to a cause of action under the Civil Rights Act of 1871: (1) that the conduct complained of was by a person acting under color of state statutes or local law, custom or usage; who (2) while so acting, deprived another of rights, privileges or immunities secured by the Constitution and laws of the United States. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The threshold issue in a suit under § 1983 is therefore whether the defendant acted under color of state statute, custom or usage for "it is axiomatic that the due process provisions of the Fourteenth Amendment proscribe state action only and do not reach acts of private persons unless they are acting 'under color of statute law.'" Browns v. Mitchell, 409 F.2d 593, 594 (10th Cir. 1969).

The Kansas State High School Activities Association is a voluntary non-profit corporation created to regulate, supervise, promote, and develop interscholastic activities among the students of the secondary schools of the State of Kansas. It is not an agency of the state or of any local governmental unit. Nevertheless, it is sanctioned and regulated by state law pursuant to K.S. A. § 72–130 et seq.; a majority of its members are state public schools; its funds come from membership dues derived, in large part, from gate receipts generated by games between members, the majority of which are held in state-owned and state-supplied facilities; it exercises general control over all activities and contests between member schools; it has exclusive control over all state athletic meets; it is authorized to conduct investigations and to assess penalties against member schools for violations of its rules; the principals of each member school are responsible to it in all matters pertaining to inter-school activities; and it determines individual eligibility in all sports.

■ In light of this pervasive influence and control exercised by the Association over the state's athletic programs, it is clear that the Association acts under color of state law, and that its actions are subject to judicial scrutiny under the purview of the Civil Rights Act. See Brenden v. Independent School District 742, 477 F.2d 1292 (8th Cir. 1973), aff'g, 342 F.Supp. 1224 (D.Minn. 1972); Mitchell v. Louisiana High School Athletic Association, 430 F.2d 1155 (5th Cir. 1970); Oklahoma High School Athletic Association v. Bray, 321 F.2d 269 (10th Cir. 1963); Reed v. Nebraska School Activities Association, 341 F.Supp. 258 (D.Neb.1972). In fact, although vigorously maintaining that the plaintiff has failed to establish the deprivation of any constitutional right, the Association concedes that it is amenable to suit under § 1983.

Having determined that the Kansas State High School Activities Association acts "under color of state law," the sole remaining issue is whether the plaintiff has in fact been denied rights, privileges or immunities secured by the Constitution and laws of the United States. Two necessary prerequisites to the resolution of the merits of the plaintiff's claim are: (1) the delineation of the scope of the Court's inquiry as it is limited by the plaintiff's pleadings; and (2) the determination of the standard of review to be applied in judging the constitutionality of the Association's rule.

## SCOPE OF REVIEW

The Association contends that the practical effect of the Court's decision in this case will be to either uphold the rule prohibiting mixed competition or to render it void. In the latter instance, the Association maintains that the Court's ruling would necessarily open the door to unlimited participation in interscholastic sports by both sexes and

thereby effectively render the demise of girls' interscholastic high school competition. The Court cannot agree with the Association's characterization of this action.

In this case, the plaintiff has not brought suit on behalf of an amorphous class of similarly situated female students desirous of equal participation in the full panoply of high school interscholastic sports. Quite to the contrary, she is suing in her individual capacity, and she is merely seeking the right to participate on her high school's only cross-country team—a non-contact sport for which she has shown considerable athletic prowess. She contends that she has been denied the right to equal participation solely on the basis of her sex.

In light of the limited nature of plaintiff's pleadings, the Court need not concern itself with the facial constitutionality or unconstitutionality of the Association's rule prohibiting girls from competing in boys' interscholastic athletic events, except insofar as the rule operates to deprive this plaintiff of her constitutional rights within the framework of the specific facts presented. The Court's inquiry is therefore limited in scope to the particular factual situation herein obtaining, and its decision will have no broader application. See Rice v. Sioux City Memorial Park Cemetery, Inc., 349 U.S. 70, 74, 75 S.Ct. 614, 99 L.Ed. 897 (1955).

## STANDARD OF REVIEW

The Court must next determine the standard of review to be applied in judging the constitutionality of the Association's rule as applied to this plaintiff. Until just recently, the United States Supreme Court had utilized a rigid two-tier approach in evaluating equal protection claims. In most instances, statutory or regulatory classifications were held to be presumptively constitutional and were not disturbed unless they were without rational basis, resting "on grounds wholly irrelevant to the achievement" of some permissible state purpose. McGowan v. Maryland, 366 U.

S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed. 2d 393 (1961); Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972); Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Where, however, the classification was grounded on certain "suspect" criteria, e.g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), or where the classification impinged upon certain "fundamental" rights, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), "strict" judicial scrutiny was required, and the classification was not permitted to stand unless justified by some "compelling governmental interest." E.g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

Under this rigid two-tier approach, the initial determination of which standard was to be applied in effect became determinative of the final outcome of the litigation. If no "fundamental right" or "suspect classification" was discernible in the statutory or regulatory scheme, the "traditional" or "rational" basis analysis automatically controlled and demanded the classification be sustained unless it was "patently arbitrary" bearing no rational relationship to a legitimate governmental interest. See Jefferson v. Hackney, supra. As noted by Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8 (1972), utilization of minimal scrutiny in theory too often resulted in no scrutiny in fact.

Although the Supreme Court has not abandoned utilization of the "compelling interest" or "strict scrutiny" test as a proper means of judging the constitutionality of statutory or regulatory rules based on "suspect classifications" or involving "fundamental rights," its more recent cases have evinced a conscious effort to expand the contours of the Equal Protection Clause by somewhat blurring

the distinctions between the strict and minimal scrutiny standards. As a result, the traditional "minimal scrutiny," "mere rationality," or "hands off" standard, which clearly tended to invite judicial hypothesizing rather than to encourage reasoned analysis of actual legislative interests, has been limited in application to economically oriented legislative schemes and has, in large part, otherwise been replaced by a more flexible balancing test fostering closer scrutiny of the competing interests obtaining in a particular case. See Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Weber v. Aetna Casualty Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Chicago Police Department v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Reed v. Reed, 404 U.S. 71, 75–77, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971).

■ By moving away from the rigidified equal protection approach previously adhered to, the Court has clearly demonstrated a willingness to scrutinize particular classifications based upon the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn in evaluating claims of violations of the Equal Protection Clause. In evaluating claims of violations of the Equal Protection Clause, the Court is accordingly now obliged to consider three basic criteria:

"[1] the character of the classification in question; [2] the individual interests affected by the classification; and [3] the governmental interests asserted in support of the classification."

Dunn v. Blumstein, *supra*, 405 U.S. at 336, 92 S.Ct. at 999.

I. *Character of the Classification.*

As previously noted and conceded by the respective parties, the only reason why the plaintiff is being denied equal participation on her high school's cross-country team is her sex. Although it has consistently been held that classifications based upon race, e.g., Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), alienage, e.g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), and national origin, e.g., Oyama v. California, 332 U.S. 633, 644–646, 68 S.Ct. 269, 274–275, 92 L.Ed. 249 (1948), are inherently suspect and must be subjected to close judicial scrutiny, it was not until the recent Supreme Court decision in Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973), that sex was added to the list of suspect classifications.[1]

In *Frontiero*, the plaintiff, a female lieutenant in the United States Air Force, claimed that pursuant to 37 U.S.C. § 401 et seq., and 10 U.S.C. § 1071 et seq., a male member of the uniformed services with dependents was entitled to an increased "basic allowance for quarters" and his dependents were automatically provided comprehensive medical and dental care upon application, while a female member of the services, such as herself, could only receive these same benefits by demonstrating that her husband was in fact dependent upon her for more than one-half of his support. She maintained that this mechanical distinction unreasonably discriminated against her on the basis of her sex in violation of the due process clause of the Fifth Amendment.

The Court analyzed the long and unfortunate history of sex discrimination especially prevalent in such areas as employment, education, and politics, which were traditionally rationalized by an at-

---

1. The Court is, of course, fully aware of the fact that the *Frontiero* is a plurality decision. Accordingly, sex, as a suspect classification, has yet to be firmly established. Nevertheless, the Court is persuaded by the reasoning of the opinion. Although perhaps more historically engrained, discrimination on the basis of sex is nonetheless as invidious as that attending race or religion.

titude of "romantic paternalism," and noted that:

"Since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . .' Weber v. Aetna Casualty & Surety Co., [406 U. S. 164, 92 S.Ct. 1400] 31 L.Ed.2d 768 (1972)."

(Frontiero v. Richardson, *supra*, 93 S.Ct. at 1770.)

The Court observed that Congress had in its wisdom already statutorily recognized the invidious nature of sex classifications. See generally, 42 U.S.C. § 2000e–2(a), (b), (c); 29 U.S.C. § 206(d); H.J.Res. No. 208, 92d Cong., 2d Sess. (1972). Finding implicit support in Reed v. Reed, supra, it accordingly determined that classifications based on sex are inherently suspect and must be subjected to strict judicial scrutiny.

■ In light of the Supreme Court's decision in *Frontiero,* and regardless of the particular semantic label attached to the test to be applied in sex-oriented cases, there can no longer be any doubt but that sex-based classifications are subject to close scrutiny by the courts under the Equal Protection Clause. Even prior to recognition of sex as a suspect classification, the Supreme Court had required more than a mere rational basis to justify such classifications. In Reed v. Reed, *supra,* 404 U.S. at 75–76, 92 S.Ct. at 253, Chief Justice Burger succinctly set forth the Court's reasoning:

"[T]his Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923 (1885) . . . The Equal Protection Clause of that amendment does,

however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. *A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'* Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)." (emphasis added)

## II. *The Plaintiff's Interest.*

■ The Kansas State High School Activities Association contends that, regardless of the nature of the classification embodied in their rule prohibiting mixed competition in interscholastic sports, the plaintiff has not alleged the deprivation of any right protected under the Federal Constitution. Although it admits that interscholastic sport is an important and integral part of a student's total educational experience, the Association relies upon San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), wherein the Supreme Court held that education is not a fundamental right. Through the process of logical deduction, it concludes that participation in interscholastic competition is a privilege, rather than a right, and that relief under the Civil Rights Act is accordingly inappropriate. Although the Court fully agrees with the Association's contention that participation in interscholastic sports is not a fundamental right, it cannot accept the conclusion which the Association draws from that fact.

This same contention was made by the state athletic association in Brenden v. Independent School District 742, *supra,* 477 F.2d at 1297, and the Eighth Circuit's response is equally appropriate here:

"The High School League contends that relief under the Civil Rights Act

is inappropriate because participation in interscholastic sports is a privilege and not a right. We disagree. The Supreme Court has rejected 'the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' Graham v. Richardson, 403 U.S. 365, 374 [91 S.Ct. 1848, 29 L.Ed.2d 534] (1971). The question in this case is not whether the plaintiffs have an absolute right to participate in interscholastic athletics, but whether the plaintiff can be denied the benefits of activities provided by the state for male students."

See also, Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963); Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327, 22 L.Ed.2d 600 (1969); Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).

The state affords interschool competition and instruction at some expense and effort, surely for the reason that it and the Kansas State High School Activities Association feel that the program is of some benefit to the participants. The importance of this aspect of the total educational experience can be gleaned from the following passage of the National Federation of State High School Athletics Association's 1970–71 Official Handbook # 9:

> "Interscholastic athletics shall be an integral part of the total secondary school educational program that has as its purpose to provide educational experiences not otherwise provided in the curriculum, which will develop learning outcomes in the areas of knowledge, skills and emotional patterns and will contribute to the development of better citizens. Emphasis shall be upon teaching 'through' athletics in addition to teaching the 'skills' of athletics."

Clearly, the benefits to be derived from interscholastic competition are substantial and are of no less value to girls than they are to boys in enhancing their overall physical and emotional development.

The plaintiff has not alleged that she has an absolute right to participate on any interscholastic team, including her high school's cross-country team, and the Court certainly would not recognize such a right. She does, however, maintain that she has a right not to be automatically disqualified from participating in interscholastic competition based solely upon her sex, rather than upon her athletic ability. Since the importance of this interscholastic competition as an integral part of the plaintiff's overall educational experience is substantial, and since she is admittedly being denied the opportunity to reap the benefits afforded by such competition solely upon the basis of her sex—a suspect classification—it is simply irrelevant whether such participation is characterized as a right or as a privilege. The Court is empowered and obliged to carefully scrutinize the Association's rule to determine whether it comports with the mandate of the Equal Protection Clause.

III. *The Association's Interests.*

As previously noted, the evidence presented in this case establishes that Tammie Gilpin is fully qualified to compete on her high school's cross-country team, and that if permitted to continue she might even earn a high school letter for her efforts. Despite the fact that all males are permitted to participate on the team, no matter how untalented, Tammie has nevertheless been deprived of an equal opportunity to participate, solely on the basis of her sex. It may, accordingly, fairly be said that the Association's rule prohibiting mixed competition, as it applies to this plaintiff, ignores individual qualifications of particular applicants and commands "dissimilar treatment for men and women who are . . . similarly situated." Reed v. Reed, *supra,* 404 U.S. at 77, 92 S.Ct. at 254.

In order for the Association's rule to withstand the strict judicial scrutiny mandated by Frontiero v. Rich-

ardson, *supra*, it is not sufficient for the Association to establish a mere rational basis for its classification, and its rule cannot be justified on the ground of "administrative convenience." See Shapiro v. Thompson, *supra*, 394 U.S. at 635, 89 S.Ct. at 1331; Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972). Furthermore, the Court will not speculate as to what unexpressed legitimate state purposes may be furthered by the Association's classification. Green v. Waterford Board of Education, 473 F.2d 629, 633 (2d Cir. 1973). Rather, the burden is on the Association to demonstrate that its classification bears a substantial relation to a legitimate state objective. Graham v. Richardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971); See Cox, The Supreme Court, 1965 Term, Foreword: Constitutional Adjudication and Promotion of Human Rights, 80 Harv.L.Rev. 91, 95 (1966). After considering the reasons advanced by the Association in support of its rule in this light, the Court is constrained to hold that it has failed to meet its burden.

The Association contends that the objective of its rule prohibiting mixed competition is to achieve equitable competition among classes, and that sex, like age, is a reasonable basis of classification to reach this objective. Although admitting that its rule treats different classes of individuals in different ways, i. e., boys and girls, the Association asserts that the purpose for the rule is to ensure the maximum interscholastic development and benefit to all students of the state.

In support of its position, the Association introduced affidavits and oral testimony of a number of respected educators involved with the physiological and emotional development of children through the medium of interscholastic sports. Its evidence tended to establish that there are indeed substantial physiological differences between males and females, a distinction for which the Court remains exceedingly grateful; that on the average the class of males is physically superior to the class of females, particularly in muscular strength and stamina, although each class includes individuals with widely different athletic abilities; and that, on the whole, females are unlikely to be able to compete on an equal basis with males in most non-contact interscholastic sports.

Based upon these physiological differences between male and female students, the Association maintains that a complete separation of even non-contact interscholastic sports between the sexes is necessary to the full development of a viable girls' interscholastic athletic program. Without its rule prohibiting mixed competition, the Association contends that girls would be forced to compete with males of higher athletic abilities, and that they would never be able to reap the benefits to be derived from individual competitive athletic achievement. The Association does not contend that Tammie Gilpin is not personally qualified to compete with boys in cross-country competition, or that such participation would in any way be either physically or emotionally harmful to her or the other male participants, but it reasons that such participation could, in some nebulous manner, jeopardize the overall development of the state's girls' athletic programs. The Court finds this reasoning constitutionally infirm.

The Court should not, and has not, judged the propriety of the ends sought to be accomplished by the Association. It agrees that the development of a viable girls' interscholastic athletic program is a desirable and legitimate state interest, and it commends the Association for its role in the advancement of that interest. Furthermore, in light of the physiological differences between males and females, the Court agrees that the separation of male and female interscholastic competition arguably bears a substantial relation to the advancement of that interest, when separate and substantially equivalent programs for males and females are in fact in existence. See Bucha v. Illinois High School Asso-

ciation, 351 F.Supp. 69, 74 (N.D.Ill. 1972). Haas v. South Bend Community School Corporation, 289 N.E.2d 495, 500 (Ind.1972). As previously noted, however, those facts simply do not exist in this instance.

Southeast High School, like so many other high schools throughout the state, has decided to provide only one cross-country team at its school. From the evidence produced in this case, it would appear that the reason for the failure to provide separate boy and girl cross-country teams is either financial or the lack of sufficient female interest. As a result of her school's action, plaintiff, through no fault of her own, must either compete on a team comprised primarily of boys or not at all. She decided the opportunity afforded by her school was better than no opportunity at all, and despite stereotyped notions of female inferiority, she has proven herself capable of competing with the other members of her team.

■ Under these circumstances, the practical effect of the Association's rule prohibiting mixed competition is not merely to prevent Tammie Gilpin's participation on a boys' cross-country team, but rather to completely bar her from participating in cross-country competition. Rather than contributing to the advancement of girls' interscholastic competition, the rule acts to totally deprive Tammie Gilpin of the opportunity to compete at all, solely on the basis of her sex. Thus, although the Association's overall objective is commendable and legitimate, the method employed to accomplish that objective is simply over-broad in its reach. It is precisely this sort of overinclusiveness which the Equal Protection Clause disdains.

In summary, it simply cannot logically be maintained that prohibiting the plaintiff's participation on her high school's only cross-country team, solely on the basis of her sex and without regard to her individual qualifications, bears any substantial or even rational relation to the Association's overall objective underlying its rule prohibiting

mixed competition. Since the Association has failed to proffer any evidence remotely tending to establish such a relation, and since the Court must require more than mere speculation and conjecture to justify the unequal treatment afforded the plaintiff in this instance, it is constrained to hold that the Association has failed to meet its burden. See Brenden v. Independent School District 742, *supra,* 342 F.Supp. at 1233–1234; Bucha v. Illinois High School Association, *supra,* 351 F.Supp. at 74.

■ The primary relief sought by the plaintiff is injunctive. In light of the Court's determination that the Kansas State High School Activities Association's rule prohibiting mixed competition is unconstitutional as applied to this particular plaintiff, such relief is clearly appropriate. Accordingly, it is ordered that Tammie Gilpin be permitted to compete on the boys' cross-country team at Southeast High School during the remainder of the current school year. In addition, the Kansas State High School Activities Association is enjoined from imposing any sanction or penalty upon Southeast High School for complying with this Court's order, and it is similarly enjoined from imposing any sanction or penalty upon any other high school for engaging in interscholastic competition with Southeast High School.

■ In addition to injunctive relief, the plaintiff also seeks actual, nominal, and exemplary punitive damages. Although both actual and nominal damages are recoverable in an action brought pursuant to § 1983, both must be proved. Admittedly, the plaintiff was prevented from participating in her school's first two cross-country meets, but no evidence was introduced establishing either: (1) that she actually suffered any monetary or compensatory damages; or (2) that she was subjected to hurt feelings, outrage, embarrassment or humiliation. Accordingly, although the Court does not mean to in any way minimize the importance of the plaintiff's rights, it cannot permit the recovery of actual or

nominal damages. See United States ex. rel. Motley v. Rundle, 340 F.Supp. 807 (E.D.Pa.1972); Cf. Williams v. Eaton, 443 F.2d 422 (10th Cir. 1971).

 With regard to the plaintiff's claim for punitive damages, the general rule repeatedly found in the reported cases is that they may be imposed if a defendant has acted wilfully and in gross disregard for the rights of the complaining party. Roberts v. Pierce, 398 F.2d 954 (5th Cir. 1968). Since such damages are punitory and are assessed as an example and warning to others, they are not a favorite in law and are to be allowed only with caution and within narrow limits. Northwestern National Casualty Company v. McNulty, 307 F.2d 432 (5th Cir. 1962); Aladdin Manufacturing Company v. Mantle Lamp Company of America, 116 F.2d 708 (7th Cir. 1941). In this case, there was absolutely no evidence that the Kansas State High School Association acted maliciously or in gross disregard of the plaintiff's rights. Punitive damages, therefore, are not recoverable.

The foregoing constitutes this Court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

It is therefore ordered that the injunctive relief sought by plaintiff be, and the same is hereby granted.

It is further ordered that plaintiff's request for actual, nominal and punitive damages be, and the same is hereby, denied.

It is further ordered that the costs herein are assessed against the defendant, The Kansas State High School Activities Association, Inc. The question of the allowance of attorney fees is reserved for future determination. The Clerk shall enter judgment accordingly.

### SUPPLEMENTAL MEMORANDUM ORDER

Plaintiff filed this action under 42 U.S.C. § 1983, seeking preliminary and permanent injunctive relief and damages based upon the alleged violation of her constitutional right to equal protection of the laws as guaranteed by the Fourteenth Amendment. The Court granted injunctive relief, holding the rule of the Kansas State High School Activities Association prohibiting mixed interscholastic athletic competition unconstitutional, as applied to this plaintiff. This matter is presently before the Court on plaintiff's motion for reasonable attorneys' fees against the defendant Kansas State High School Activities Association. Having now been fully advised in this matter, the Court makes the following findings and orders.

 The traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1967); Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1880); Day v. Woodworth, 13 How. (54 U.S.) 363, 14 L.Ed. 181 (1852). Federal courts may, however, award attorneys' fees in the exercise of their equitable powers when the interests of justice so require. Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). As noted by the Supreme Court in Hall v. Cole, 412 U.S. 1, 4, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973):

> "Indeed, the power to award such fees 'is part of the original authority of the chancellor to do equity in a particular situation,' Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever 'overriding considerations indicate the need for such a recovery.' Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970); see Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967)."

Many commentators have called for a liberalization or complete rejection of the traditional American rule, arguing

that attorneys' fees should automatically be taxed to the losing litigant as costs. See, e. g., Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Calif.L.Rev. 792, 793 (1966); Stoebuck, Counsel Fees Included in Costs: A Logical Development, 38 U.Colo.L.Rev. 202 (1966); Kuenzel, The Attorney's Fee: Why Not a Cost of Litigation?, 49 Iowa L.Rev. 75 (1963); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn.L.Rev. 619 (1931); Comment, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U. Chi.L.Rev. 316 (1971); Note, Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand.L.Rev. 1216 (1967). Not unexpectedly, the courts have been hesitant to follow this suggestion. They have, however, utilized their equitable powers to carve out three generic exceptions to the traditional American rule. These exceptions are commonly referred to as: (1) the "obdurate obstinacy" exception; (2) the "common fund" exception; and (3) the "private attorney general" exception.

### 1. Obdurate Obstinacy.

 The first and perhaps most firmly established exception to the traditional American rule is illustrated by those "exceptional cases" where the behavior of a litigant has reflected a wilful and persistent "defiance of the law," or where "an unfounded action or defense is brought or maintained in bad faith, vexatiously, wantonly, or for oppressive reasons." 6 Moore's Federal Practice 1352 (1966 ed.); see, e. g., Newman v. Piggie Park Enterprises, Inc., supra, 390 U.S. at 402 n. 4, 88 S.Ct. at 966; Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Bell v. School Bd. of Powhatan County, 321 F.2d 494 (4th Cir. 1963); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4th Cir. 1951). The award of attorneys' fees under this exception is punitive in nature and therefore is limited to those cases where a defense is maintained in "bad faith" without any basis

in law or fact and represents "obdurate obstinacy."

 The plaintiff is clearly not entitled to attorneys' fees in this case under this exception. Admittedly, the defendant violated the plaintiff's constitutional rights, but such violation, in and of itself, does not permit the assessment of attorneys' fees as a punitive measure. The record is simply void of any evidence of "bad faith" on the part of the defendant. Accordingly, the Court must look elsewhere.

### 2. Common Fund or Benefit.

 A second exception commonly relied upon by the courts to ameliorate the inequities inherent in the traditional American rule comes into play when a plaintiff's successful litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." Mills v. Electric Auto-Lite, supra, 396 U.S. at 393–394, 90 S.Ct. at 626. Traditionally, this exception applies when, suing in a representative capacity, a plaintiff creates or traces a "common-fund," the benefit of which is shared by all members of a class. See, e. g., Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882). As noted by the Supreme Court in Hall v. Cole, supra, 412 U.S. at 4–5, 93 S.Ct. at 1946–1947:

> " 'Fee-shifting' is justified in these cases, not because of any 'bad faith' of the defendant but, rather, because 'to allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.' "

The purpose for this exception is not designed "as an additional recovery against the wrongdoers, but as a means of ordering compensation to counsel from the class benefited." Bangor & A.

R. Co. v. Brotherhood of Loc. Fire. & Eng., 143 U.S.App.D.C. 90, 442 F.2d 812, 823 (1971).

Traditionally, attorneys' fees were awarded under this exception only in those cases where actual monetary funds were created for specific classes. Trustees v. Greenough, *supra*. In Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), however, the doctrine was extended to authorize the award of attorneys' fees to a successful plaintiff who, although suing on her own behalf alone, nevertheless established the right of others not party to the suit to recover out of specific assets of the same defendant through operation of *stare decisis*. More recently, the doctrine was further extended in Mills v. Electric Auto-Lite Co., *supra*, wherein the Supreme Court approved the award of attorneys' fees to a successful shareholder who set aside a corporate merger for violations of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). Although not directly or indirectly creating a pecuniary fund, the Court reasoned that the plaintiff had vindicated important interests of both the corporation and "the stockholders as a group" by successfully enforcing statutory policy. By permitting the reimbursement of plaintiff's attorneys' fees out of the corporate coffer, the Court simply shifted the costs of litigation to "the class that ha[d] benefited from them and that would have had to pay them had it brought the suit." *Id.*, at 397, 90 S.Ct. at 628.

*Mills* represents a marked extension of the "common fund" exception to the traditional American rule, but not a radical departure. Utilizing the equitable doctrine of unjust enrichment, it merely extends the applicability of the exception to instances where a substantial "benefit," whether pecuniary or not, is bestowed upon an ascertainable class or group. In addition, however, and perhaps more notably, *Mills* also recognizes that the vindication of congressional policy, in and of itself, is a substantial benefit to the class of individuals intended to be protected thereby. Consequently, *Mills* represents both a defensive and offensive use of the Court's equitable powers—defensive, to prevent unjust enrichment of free riders and offensive, to promote the effective implementation of Congressional objectives. La Raza Unida v. Volpe, 57 F.R.D. 94, 98 (N.D.Cal. 1972); Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U.Chi.L.Rev. 316 (1971).

Admittedly, the plaintiff in this action neither represented a definite class nor directly or indirectly obtained relief bestowing a pecuniary benefit upon others not party to this action. Accordingly, under the more traditional approach the "common fund" exception would not justify the awarding of attorneys' fees. Plaintiff, however, maintains that an award of attorneys' fees is authorized in this instance by applying the form of analysis approved in *Mills*, since: (1) by bringing this action, she successfully vindicated congressional policy and a right guaranteed by the United States Constitution, *i. e.*, the right to equal protection of the laws, particularly with regard to sex; (2) the relief afforded, although not directly benefiting others not party to the litigation, does indirectly benefit an ascertainable class through operation of *stare decisis*, *i. e.*, similarly situated women students desirous of equal athletic opportunities, as well as the public at large; and (3) by virtue of its subject matter jurisdiction, the Court is in a position to evenly spread the costs of litigation among those benefiting from the institution of the action.

Despite the appealing nature of the plaintiff's reasoning, *Mills* was not intended to permit carte blanche assessment of attorneys' fees as costs to a successful litigant in every case merely because statutory policy was vindicated and others not party to the litigation were indirectly benefited thereby in some nebulous manner. Rather, as previously noted, the decision in *Mills* was premised, at least in part, upon the doctrine of unjust enrichment. Accordingly, in the strictest sense *Mills* sanctions

"fee-shifting" only so long as the class actually taxed has in fact benefited from the suit in some appreciable manner. See, Hall v. Cole, *supra,* 412 U.S. at 5–7, 93 S.Ct. at 1947–1948; Contra, Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., *supra,* at 327. It is therefore initially incumbent upon a court to determine who, in fact, will ultimately bear the burden if attorneys' fees are assessed against a particular defendant.

In this instance, the Kansas State High School Activities Association, Inc. (hereinafter referred to as KSHSAA) is a nonprofit corporation sanctioned and regulated by Kansas law pursuant to K. S.A. § 72–130 et seq. Its primary, if not sole, source of income is obtained from membership dues payed by member high schools of the State and derived, in large part, from gate receipts generated by athletic competition between member schools. By assessing attorneys' fees against KSHSAA, the Court would therefore be reaching into the pocket of not only that organization, but of the member schools as well. Ultimately, the burden would be borne by the students, parents, and patrons of the schools, as well as the public at large.

Due to the extensive and diverse nature of the class potentially affected by an award of attorneys' fees, as well as the attendant difficulties involved in tracing the benefits of the plaintiff's litigation to their ultimate beneficiaries, it is apparent that the "benefit" rationale approved by the Supreme Court in *Mills* is not sufficiently pliant, *in and of itself,* to justify the award of attorneys' fees in this case. See, La Raza Unida v. Volpe, *supra,* 57 F.R.D. at 97. Through the logical extension of the courts' equity powers exemplified by the remedial nature of the "benefit" rationale employed in *Mills,* however, a third exception to the traditional American rule has been suggested within which the present case more appropriately fits.

### 3. *Private Attorney General.*

■ By judging the propriety of an award of attorneys' fees under the three judicially recognized exceptions, the Court does not intend to imply that they are mutually exclusive—they are not. A slight deviation from one of the established elements of any of the exceptions does not, *ipso facto,* deprive a plaintiff of an award should the Court decide that equity dictates the award. Sierra Club v. Lynn, 364 F.Supp. 834, 847 (W. D.Tex.1973). The vitality of this principle is exemplified by the third judicially recognized exception to the traditional rule, which is itself a hybrid.

In Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed. 2d 1263 (1968), in interpreting the scope of the reasonable attorneys' fee provision under Title II of the Civil Rights Act of 1964, § 204(b), 42 U.S.C. § 2000a–3(b), the Supreme Court found that fees were awardable as costs "not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II." In limiting the discretion of the trial court, the Court stated:

"If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts.

. . .

It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover attorneys' fees unless special circumstances would render such an award unjust." *Id.,* at 401, 88 S.Ct. at 966.

Viewing a plaintiff suing under Title II as a "private attorney general," the Court thus established the award of attorneys' fees as the ordinary, rather than exceptional, procedure.

The Court in *Newman* recognized that, although enacting statutes to im-

plement strong national policy, Congress would often leave the enforcement of that policy to private individuals of limited financial means; that plaintiffs bringing suits to enforce that policy would often benefit a class of people far broader than those actually involved in the litigation; that such plaintiffs would normally only seek equitable relief and rarely recover significant damage awards; and that if forced to bear their own attorneys' fees few aggrieved parties would be in a position to further the public interest. An award of attorneys' fees therefore served to: (1) eliminate the impediments to *pro bono publico* litigation; and (2) carry out congressional policy.

Admittedly, *Newman* involved a suit brought under a civil rights statute which makes specific allowance for attorneys' fees, but it has nonetheless touched a responsive chord. Relying upon the "private attorney general" concept recognized in *Newman,* a logical extension of the "benefit" rationale adopted in *Mills,* and the courts' traditionally broad equity powers noted in *Sprague,* the federal judiciary has of late been increasingly willing to award attorneys' fees, despite strict inapplicability of the traditional exceptions and the absence of specific statutory authority. See, Natural Resources Defense Council, Inc. v. Environmental Protection, 484 F.2d 1331 (1st Cir. 1973) (fees awarded to plaintiff seeking EPA compliance with Clean Air Amendments of 1970, 42 U.S.C. § 1857c–5 et seq.); Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972) (fees awarded to plaintiff claiming violation of 42 U.S.C. § 1981); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972) (fees awarded to plaintiff claiming racial discrimination under 42 U.S.C. §§ 1981–1983, 1988); Donahue v. Staunton, 471 F.2d 475 (7th Cir. 1972) (fees awarded to plaintiff alleging violation of equal protection clause under 42 U.S.C. § 1983); Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971) (fees awarded to plaintiff proving discrimination in housing under 42 U.S.C. § 1982); Stan-

ford Daily v. Zurcher, 366 F.Supp. 18 (N.D.Cal.1973) (fees awarded to plaintiff claiming violation of Fourth Amendment under 42 U.S.C. § 1983); Sierra Club v. Lynn, 364 F.Supp. 834 (W.D.Tex.1973) (fees awarded to plaintiff forcing compliance with National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.); Wyatt v. Stickney, 344 F.Supp. 387 (M.D.Ala.1972) (fees awarded to plaintiff alleging violation of civil rights); Jinks v. Mays, 350 F.Supp. 1037 (N.D.Ga.1972) (fees awarded to plaintiff alleging violation of equal protection clause under 42 U.S.C. § 1983); La Raza Unida v. Volpe, *supra* (fees awarded to plaintiff enjoining building of highway for failure to comply with Department of Transportation Act of 1966, § 4(f), 49 U.S.C.A. § 1653(f); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972) (fees awarded to plaintiff attacking racial discrimination in hiring under 42 U.S.C. § 1983). But Cf., Bradley v. School Board of City of Richmond Va., 472 F.2d 318, 328–331 (4th Cir. 1972), cert. granted, 412 U.S. 937, 93 S.Ct. 2773, 37 L.Ed.2d 396; Woolfolk v. Brown, 358 F.Supp. 524, 535–537 (E.D.Va.1973).

The rationales advanced by the courts in support of this more liberal allowance of attorneys' fees as costs have varied considerably. Accordingly, they defy neat categorization. In essence, however, although representing a marked departure from the traditional approach, the cases merely represent a logical extension of the "benefit" rationale employed in *Mills.* Accord, Natural Resources Defense Council, Inc. v. Environmental Protection Agency, *supra,* 484 F.2d at 1333, fn. 1; Wyatt v. Stickney, *supra,* 344 F.Supp. at 408, 409.

As in *Mills,* each of the cases cited above contained common factors differentiating it from the average lawsuit, namely: (1) the plaintiff was suing under a federal statute embodying strong national policy, intended to protect large segments of the public sector, yet left to the private citizenry to enforce; (2) the plaintiff was seeking equitable relief

and significant damages were not recoverable; (3) as a result of the action, others not directly party to the litigation were benefited in some significant nonpecuniary manner; and (4) due to the court's subject matter jurisdiction, an equitable distribution of attorneys' fees among those benefiting from the action was feasible. Unlike *Mills*, however, the benefited class in each of these cases was large and of a diverse nature, in many instances encompassing the public at large. Accordingly, defensive utilization of an award of attorneys' fees under the guise of preventing unjust enrichment, seemingly relied upon by the Court in *Mills*, was awkward. Rather than stretch the "common fund" exception beyond recognition, the courts turned to the remedial function of awarding attorneys' fees epitomized by the "private attorney general" concept.

In *Mills*, the Supreme Court had made repeated references to the therapeutic nature of an award of attorneys' fees, noting that: "private stockholders' actions . . . 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." *Mills, supra,* 396 U.S. at 396, 90 S.Ct. at 628. Although the Court had professed partial reliance upon the theory of unjust enrichment, the decision was viewed as resting heavily on the acknowledgment of "overriding considerations," that private suits are necessary to effectuate congressional policy and that awards of attorneys' fees are necessary to encourage private litigants to initiate such suits—the "private attorney general" concept. See, Note, The Supreme Court, 1969 Term, 84 Harv.L.Rev. 1, 216–217 (1970); Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., *supra,* at 327–328. The courts accordingly interpreted *Mills* as implicitly, if not explicitly, supporting the extension of the "private attorney general" concept recognized in *Newman* to any case, regardless of specific statutory authorization, "where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself." *Mills, supra,* 396 U.S. at 392, 90 S.Ct. at 626.

Interpreting *Mills* broadly in this manner, the courts have coupled the notion of spreading litigation costs equitably among all the beneficiaries with that of encouraging suits which promote the public interest. The "benefit" rationale provides the framework for analysis. As noted in Natural Resources Defense Council, Inc. v. Environmental Protection Agency, *supra,* 484 F.2d at 1333, fn. 1:

"[T]he concept of 'benefit' includes any substantial improvement, financial or otherwise, provided to the beneficiary group. Whether that group is limited or includes the whole public should therefore ordinarily not affect the form of analysis. The number of beneficiaries would be important only when the court needed to determine whether the benefit was sufficiently large to justify an award of fees, or when the fees would be calculated to relate to the quantum of benefit."

Accordingly, the size of the benefited class in a particular case no longer serves as an impediment to the award of attorneys' fees, assuming the form of analysis applied in *Mills* is otherwise satisfied.

Admittedly, neither *Newman* nor *Mills*, standing alone, explicitly supports this more liberal approach to awarding attorneys' fees. When viewed in juxtaposition, however, they do evince a definite trend on the part of the Supreme Court toward permitting utilization of "fee shifting" in appropriate cases as a means of making an award of attorneys' fees a part of the effective remedy a court can fashion to carry out congressional policy. See, Lee v. Southern Home Sites Corp., *supra,* 444 F.2d at 144; Cf., J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 428 (1964).

The recent trend toward utilizing the award of attorneys' fees as a remedial

method of effectuating congressional policy, although gaining in popularity, is not universally accepted. In Bradley v. School Board of City of Richmond Va., *supra*, the Fourth Circuit Court of Appeals refused to follow the trend holding that it was the proper function of the legislative branch, rather than the judicial branch, to determine what remedies are appropriate to effectuate congressional policy. *Id.*, at 328–331. Noting that the ramifications of the new approach were limitless, the Court expressed the fear that the courts were creating remedies never intended by Congress. This same argument was raised by Justice Black in his dissenting opinion in *Mills*, but was rejected by the majority of the Court. Similarly, although finding the reasoning logically sound, this Court does not find it persuasive.

■ The notion of utilizing the equitable federal powers to imply remedies not specifically provided statutorily is not new. Act of May 8, 1792, § 2, 1 Stat. 276; Wright, Law of Federal Courts, 257 (2d ed. 1970); Cf., Stanford Daily v. Zurcher, *supra*, 366 F.Supp. at 23. On the contrary, the courts have seen fit on numerous occasions to imply equitable and legal remedies from statutes when necessary to effectuate congressional policy underpinning the substantive provisions of a statute. See, Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 213, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); J. I. Case Co. v. Borak, *supra*; Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 402, 91 S.Ct. 1999, 2008, 29 L.Ed.2d 619 (1971); Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The power of the federal judiciary to supplement statutory remedies in appropriate case, although certainly not limitless, is consequently firmly established.

■ Certainly, there are instances when statutory remedies are so meticulously drawn as to imply congressional preclusion of an award of attorneys' fees as an additional remedy absent applicability of the traditional exceptions. See Fleischmann v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Those instances are, however, few and far between, and in most cases Congress is merely silent. As noted in Sprague v. Ticonic National Bank, *supra*, 307 U.S. at 116, 59 S.Ct. at 780, congressional silence, standing alone, does not preclude an award of attorneys' fees. The authority to grant or deny fees in a particular case derives not from Congress, but rather from the long standing and traditionally broad equity powers of the courts.

■ The question before a court in a particular case is not, therefore, whether it has the equitable power to award attorneys' fees, but rather whether in the exercise of its equitable powers the interest of justice requires that fees be shifted. Following the general form of analysis articulated in *Mills* and Newman v. Piggie Park Enterprises, *supra*, the Court is satisfied that the exercise of its equitable powers in the case *sub judice* is appropriate. In reaching this conclusion, the Court considered a number of factors, including: (a) the importance of the congressional policy sought to be enforced; (b) the necessity and financial burden of private enforcement; (c) the number of individuals benefited by the plaintiff's efforts; and (d) the ability to spread or shift the attorneys' fees to those actually benefited, or to the public at large. See, La Raza Unida v. Volpe, *supra*, 57 F.R.D. at 99.

a. *Congressional Policy.*

Little discussion is required with regard to the importance of the policy upon which this action was premised. This Nation has a long and unfortunate history of sex discrimination manifesting itself in every conceivable field of endeavor. See, M. Gruberg, Women in American Politics 4 (1968); K. Amundsen, The Silenced Majority: Women and American Democracy (1971). Although women have made significant steps to-

ward alleviating this situation, complete equality between the sexes has yet to be realized. As noted by the Supreme Court in Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973):

"[I]t can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, on the job market and, perhaps most conspicuously, in the political arena." (citations omitted).

Accordingly, although more subtle in nature, discrimination on the basis of sex is no less pervasive or invidious than discrimination on the basis of race, alienage, or national origin.

Ever more cognizant of the inferior position occupied by women in our society, Congress has of late manifested an increasing sensitivity toward sex-based classifications. This sensitivity is exemplified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), (b) & (c), the Equal Pay Act of 1963, 29 U.S.C. § 206(d), § 1 of the Equal Rights Amendment, H.J.Res. No. 208, 92d Cong., 2d Sess. (1972), and amendments to various statutory schemes. See, 5 U.S.C. § 2108, as amended, 85 Stat. 644; 5 U.S.C. § 7152, as amended, 85 Stat. 644; 5 U.S.C. § 8341, as amended, 84 Stat. 1961; 38 U.S.C. § 102(b), as amended, 86 Stat. 1074. It may, therefore, fairly be said that the elimination of discrimination on the basis of sex occupies a preferred position on the list of congressional priorities.

The plaintiff alleged that she had been denied equal participation on her high school's only cross-country team solely on the basis of her sex, rather than on the basis of her individual athletic prowess. In granting injunctive relief, the Court found that the KSHSAA rule against mixed competition was in fact violative of the equal protection clause of the Fourteenth Amendment, as applied to the plaintiff. Although only obtaining limited relief, the plaintiff's efforts nonetheless made a significant contribution to the advancement of an important congressional policy.

b. *Private Enforcement.*

The plaintiff brought this action under the broad umbrella of the Civil Rights Act, 42 U.S.C. § 1983, a statute promulgated to effectuate the provisions of the United States Constitution. In enacting the statute, Congress recognized that the protection of individual constitutional rights was too important a task to be left in the hands of state and local authorities who, in many instances, were the perpetrators of constitutional deprivations. It therefore provided a method of private enforcement of those rights. As a result, the burden of assuring full compliance with the Constitution has devolved upon private concerned citizens, such as the plaintiff, and their attorneys. Lee v. Southern Home Sites Corp., *supra*, 429 F.2d at 295.

It must, therefore, be said that a citizen seeking relief under the Civil Rights Act acts not only for himself or herself, but also as a "private attorney general," enforcing rights cherished by us all. See, Jinks v. May, *supra*; NAACP v. Allen, *supra*; Knight v. Auciello, *supra*; Long v. Georgia Kraft Co., 455 F.2d 331 (5th Cir. 1972), and the cases cited therein. In clothing the private citizenry with this status and burden, however, Congress did not specifically provide for the award of attorneys' fees to successful litigants suing under § 1983. As a result of the financial burden occasioned by rising counsel fees, coupled with the often minuscule nature of damages, if any, recovered under the Act, private litigation has been stifled, and the policy upon which the Act is premised has gone unfulfilled. Cf., Newman v. Piggie Park Enterprises, *supra*. Accordingly, the operation of the traditional American rule has served as an obstacle to a judicial determination of rights.

Viewed in this perspective, utilization of the Court's equitable powers to award

attorneys' fees is appropriate not only to compensate those unnecessarily required to seek judicial enforcement of rights guaranteed by the United States Constitution, but more importantly to encourage private litigation and thereby effectuate the underlying congressional purpose embodied in § 1983. As noted in Stanford Daily v. Zurcher, *supra*, 366 F.Supp. at 24:

> "42 U.S.C. § 1983 and its jurisdictional concomitant, 28 U.S.C. § 1343(3) represents congressional indication that federal courts should use their equitable powers to insure vindication of the rights protected by the Constitution and laws from infringement by those acting under color of state law. . . . The *raison d'etre* of 42 U.S.C. § 1983 is to encourage the vindication of constitutional rights, to promote litigation of the rights involved, and to give the courts leeway to fashion appropriate remedies. *Cf.*, 42 U.S.C. § 1988." (Citations omitted.)

Accordingly, it is clear that Congress did not intend to preclude an award of attorneys' fees as a means of effectuating statutory policy.

### C. *Benefit.*

 Although the plaintiff did not bring a class action or obtain far reaching equitable relief, it can hardly be doubted that she rendered a significant service to others not party to the suit. As previously noted, she occupied the status of a "private attorney general" in bringing this action, and as a result of her efforts significant congressional policy was vindicated. In essence, the public at large was the ultimate beneficiary of the plaintiff's suit. Under an expansive interpretation of the "benefit" rationale approved in *Mills*, an award of attorneys' fees would therefore be appropriate. Natural Resources Defense Council, Inc. v. Environmental Protection Agency, *supra*. In addition, however, the plaintiff has bestowed a tangible benefit upon an identifiable class making the exercise of the Court's equitable powers even more compelling.

Recently, and prior to the institution of this suit, the law regarding the right of women to equal participation in high school athletic competition was in a state of flux and development. Numerous suits had been filed in an attempt to delineate the extent and scope of that right. Compare, Brenden v. Independent School District 742, 477 F.2d 1292 (8th Cir. 1973), affirmed, 342 F.Supp. 1224 (D.Minn.1972); Magill v. Avonworth Baseball Conference, 364 F.Supp. 1212 (W.D.Pa.1973); Baltic Independent School District 115 of Minnehaha County, South Dakota v. South Dakota High School Activities Association, 362 F.Supp. 780 (D.S.D.1973); Ritacco v. Norwin School District, 361 F.Supp. 930 (W.D.Pa.1973); Reed v. Nebraska Activities Association, 341 F.Supp. 258 (D.Neb.1972); Bucha v. Illinois High School Association, 351 F.Supp. 69 (N.D.Ill.1972); Haas v. South Bend Community School Corporation, 289 N.E.2d 495 (Ind.1972). Due to the efforts of this plaintiff and others like her, much of the confusion previously extant has been and is being eliminated. Admittedly, this suit will not settle all future disputes. Nevertheless, it has contributed significantly to defining the permissible limits of sex differentiation, and hopefully provided valuable guidance to the KSHSAA and its member schools for future action.

In addition, and perhaps more notably, by vindicating her own right to participate on a previously all male athletic team, the plaintiff necessarily rendered a substantial service to her fellow students, as well as the class of women as a whole. When a student is deprived of the opportunity to participate equally in educational activities, solely on the basis of sex, the rights of all students are threatened. By vindicating her own rights, a successful litigant accordingly dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the advancement of equal opportunities, they frequently prove beneficial not only in the immediate impact of the result achieved,

but in their implications for future conduct as well. Cf., Hall v. Cole, *supra*, 412 U.S. at 4–5, 93 S.Ct. at 1947–1948.

### d. *Fee Shifting.*

Despite the valuable service the plaintiff has rendered in bringing this suit, she did not recover any damages. Accordingly, although others not party to the action have potentially benefited significantly from her efforts, the plaintiff has been forced to individually shoulder the entire burden of litigation expenses. In light of the importance of the congressional policy vindicated by the plaintiff and the need to encourage future *pro bono* litigation of this nature, the Court is satisfied that "overriding considerations" indicate the need for an award of attorneys' fees. *Mills, supra,* 396 U.S. at 391–392, 90 S.Ct. at 625.

As previously noted, an assessment of attorneys' fees against the KSHSAA will, in effect, reach into the pockets of not only that organization, but of the member schools, their parents, patrons and students, as well as the public at large. Since the Court has determined that each of these groups has benefited from the institution of this action, utilization of the "fee shifting" approach approved by the Supreme Court in *Mills* and Hall v. Cole, *supra,* is therefore appropriate.

■ In determining the amount of an award of reasonable attorneys' fees, the Court is mindful that the award is designed to effectuate public policy, encourage private litigation, and spread litigation expenses equitably among those benefiting from the institution of the action—not to punish the wrongdoer or to reward the successful plaintiffs or their attorneys. A member of the legal profession has the obligation to represent clients who are unable to pay for counsel and also to bring suits in the public interest. While embarking upon their duties, they should not be motivated by a desire for profit but by public spirit and sense of duty. Accordingly,

although those who satisfy these responsibilities should be adequately remunerated for their most valuable services, their fees should not be exhorbitant.

In Wyatt v. Stickney, *supra,* 344 F. Supp. at 409–410, Chief Judge Johnson of the United States District Court for the Northern District of Alabama likened the role of the attorney involved in public interest litigation to that of the attorney representing an indigent criminal defendant under the Criminal Justice Act. Although recognizing that the Act's fee schedule was below the normal levels of compensation in legal practice, the court reasoned that "it nevertheless is considered a reasonable basis upon which lawyers can carry out their professional responsibility without either personal profiteering or undue financial sacrifices." 1964 U.S.Code Cong. & Admin.News, p. 2997.

■ Although the Court does not intend to in any way belittle the valuable nature of the service rendered by the plaintiff's counsel in this case, it finds itself in complete accord with the reasoning of Chief Judge Johnson. Accordingly, on the basis of the fee schedule set forth in the Criminal Justice Act, the Court has determined that a reasonable fee in this case is $30 per in-court hour and $20 per out-of-court hour. In addition, the Court has permitted miscellaneous expenses reasonably incurred.

On the basis of the time-sheet submitted by plaintiff's attorneys, which appears to be accurate and reasonable for such a matter as this,

It is ordered that plaintiff's motion for the assessment of reasonable attorneys' fees and expenses as costs against the defendant Kansas State High School Activities Association, be, and the same is hereby, sustained in the amount of $1,233.19, encompassing an attorney fee allowance of $1150.00, and expenses of $83.19.

It is further ordered that the defendant pay accrued court costs herein.