647 F.2d 651
 YELLOW SPRINGS EXEMPTED VILLAGE SCHOOL DISTRICT BOARD OF
EDUCATION, et al., Plaintiffs-Appellees,
v.
OHIO HIGH SCHOOL ATHLETIC ASSOCIATION, et al.,
Defendants-Appellants.
YELLOW SPRINGS EXEMPTED VILLAGE SCHOOL DISTRICT BOARD OF
EDUCATION, et al., Plaintiffs-Appellees,
v.
OHIO STATE BOARD OF EDUCATION, et al., Defendants-Appellants.
 Nos. 78-3131, 78-3132.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 12, 1980.
Decided April 28, 1981.
 
 Henry Maser, Carlisle O. Dollings, Columbus, Ohio, for Ohio High School Athletic Assn.
 Thomas F. Staub, Gary E. Brown, Thomas V. Martin, Asst. Attys. Gen., for Ohio State Bd. of Ed.
 Randal S. Bloch, Wagner & Bloch, , Cincinnati, Ohio, Barbara Kaye Besser, Charles Guerrier, Jane M. Picker, Cleveland, Ohio, for plaintiffs-appellees.
 Before BROWN, KENNEDY and JONES, Circuit Judges.
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 Appellee Yellow Springs filed suit against appellants, Ohio State Board of Education, its members, and Ohio High School Athletic Association (OHSAA), asking that the District Court declare a rule of the OHSAA proscribing coeducational teams in contact sports a violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and unconstitutional and enjoin defendants from enforcing it. The District Court granted plaintiffs' motion for summary judgment, holding that the OHSAA's activities constituted state action; that the regulation, 45 C.F.R. § 86.41, on which the OHSAA asserted its rule was based was unconstitutional; and that the Ohio State Board of Education, the State Superintendent of Public Instruction and Robert Holland, Assistant Director of Health, Physical Education and Recreation at the Ohio Department of Education (hereinafter state defendants) were liable for the actions of the OHSAA and properly enjoined. Appellants, state defendants and the OHSAA, urge this court to reject each of these conclusions of law and reverse the judgment of the District Court.
 
 
 2
 Yellow Springs is a very small school district composed of 950 students, 220 of whom were in the middle school, at the time suit was filed. The school district determined that at the middle school level mixed-sex athletic teams have educational advantages and thus tried to emphasize coeducational activities in general. This decision was based on the school district's observation that girls and boys at this level have essentially the same athletic skills. However, Yellow Springs was unable to offer a coed basketball team, because the rules of the OHSAA prohibit coed teams in interscholastic contact sports, and basketball is defined as a contact sport. This practice was called into question when in the fall of 1974 two Yellow Springs middle school girls tried out for and made the boys' basketball team. They were not permitted to participate since if Yellow Springs attempted to field girl team members it would be prohibited by the OHSAA from participating in interscholastic competition. The school district then attempted to set up a girls' team; however, there were no other girls' teams against which it could play that year. It has since fielded a girls' team. Yellow Springs also attempted by a referendum of member schools of the OHSAA to change the rule to permit coed teams within an individual school's discretion but was unsuccessful. Fearing that compliance with the OHSAA rule violated federal law and might render it ineligible for federal funds, Yellow Springs filed this suit.
 
 
 3
 The OHSAA is a voluntary unincorporated association to which virtually all senior high schools (defined as schools which have seventh grade students and above) in Ohio belong. It therefore includes as members junior high school, middle schools, and senior high schools. It was organized in the 1920's by various school administrators who wanted to achieve many of the benefits of such a body since they were not provided by the State Board of Education. The OHSAA organizes competitions, sets up schedules, arranges places to play tournament games (including school facilities), and provides injury insurance. It also prescribes uniform rules of play and has the power to sanction schools which violate them. Schools belong as individuals, and both state-accredited private and public schools may be members. The overwhelming majority of members, approximately 90% from 1972 to 1976, are public schools.
 
 
 4
 In order to be a member of the OHSAA, a school must be accredited by the State Board of Education. Membership in the OHSAA is a virtual necessity, since the State Board does not provide any interscholastic athletic programs although it has the authority to do so. Considering the importance of athletics to a well-rounded education, it is evident that individual schools or school districts would be required to find a replacement for the OHSAA's activities if the OHSAA did not exist. There has naturally grown up an entanglement, both actual and perceived, between individual schools and the OHSAA. For example, throughout his deposition, Dr. Harold Meyers, OHSAA Commissioner, referred to the schools' coaches as "our coaches." Individual schools may vote on and approve rules and regulations of the OHSAA and may also be expelled from membership if they do not comply. School budgets provide funding for training and travel to OHSAA meets, and the OHSAA returns some money to schools if it operates with a surplus in a particular year. Most of the OHSAA's budget of approximately one million dollars is generated through tournaments, many of which are held on school or public property. Local school board members have an interest in and have participated voluntarily in governing the OHSAA.
 
 
 5
 Although state law provides no authority for the State Board to engage in activities such as those of the OHSAA, the State Board does participate in and has influenced the OHSAA's activities. It cooperates by providing information concerning school eligibility while individual schools provide similar information concerning students. The State Board provides one of its assistant members, who also oversees extracurricular athletics, as a member ex officio of the OHSAA Board of Commissioners. He has no vote, but he does provide advice to the OHSAA and reports back to the State Board. In fact it was the State Board member who earlier advised the OHSAA that another of its rules (which was thereafter changed) might not be in compliance with the regulations under Title IX.
 
 
 6
 The District Judge found that the OHSAA's activities constituted state action. He found that the OHSAA was dependent on the use of public facilities for its operating revenue and noted the involvement of public officials in OHSAA decisionmaking. The trial judge found that public schools predominated in its membership. Finally, the District Judge found significant the OHSAA's ability to sanction state schools for noncompliance with its rules, a role which permitted "a technically non-governmental entity to dictate terms to a state entity." For example, its rules have provided that the school administrator must assume the financial responsibility for interscholastic athletics and may not delegate the responsibility to other members of the staff except under certain conditions.
 
 
 7
 The rules even regulate school participation in non-OHSAA meets. The judge concluded that the OHSAA functioned as an instrumentality of the state and as an agent of the schools. The OHSAA's character as a semi-official in its activities and its symbiotic relationship with the state, Fortin v. Darlington Little League, Inc., 514 F.2d 344, 347 (1st Cir. 1975), lead to the conclusion that the trial judge correctly found state action. See Gilpin v. Kansas State High School Activities Association, 377 F.Supp. 1233, 1237 (D.Kan.1973); Bucha v. Illinois High School Association, 351 F.Supp. 69, 73 (N.D.Ill.1972); Reed v. Nebraska School Activities Association, 341 F.Supp. 258, 260-61 (D.Neb.1972).
 
 
 8
 The trial judge held that the state defendants were proper parties to be enjoined. He held that in order to enjoin the state it must be shown that state officials either have a duty to enforce a challenged rule or a duty to prevent its enforcement by subordinates. He held that a cause of action exists under the second standard if the state defendants either knew or should have known of allegedly unconstitutional activity of their subordinates and encouraged it or took no steps to prevent it. The trial judge found that the state defendants do exercise some control over local boards of education and that they knew the local boards were implementing the rules of the OHSAA. He found that the state defendants substantially contributed to the creation of the unconstitutional rule by permitting the OHSAA to use public facilities and thus had a duty to end it.
 
 
 9
 This Court has dealt more specifically with state board of education liability in discrimination cases since the trial judge wrote his opinion. In Penick v. Columbus Board of Education, 583 F.2d 787 (6th Cir. 1978), aff'd, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), although the District Judge had found intentional support for segregation in a state board's failure to take action to end the segregation, this Court found it necessary to remand for more detailed fact-finding on the following specific issues: (1) the state board's knowledge of intentional practices by the local board; (2) the state board's failure to protest or restrain the local board; (3) the state board's continuing support of the local board in the face of such knowledge; (4) the motivation of the state board in failing to investigate; and (5) the effect of findings under (1) through (4). Id. at 818; accord, Reed v. Rhodes, 607 F.2d 714, 718 (6th Cir. 1979), cert. denied, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). We conclude that under the teachings of Penick and Reed we must remand. These questions cannot be answered on the present record. It is questionable whether they can be resolved on a motion for summary judgment. We do not dismiss the state defendants but remand to permit the plaintiffs to show upon further proceedings that there was "intentional support of the local board(s) in pursuing (discriminatory) practices," Id. at 718, and that they seek relief that the state can provide.
 
 
 10
 The rules of the OHSAA apply to both senior high schools and junior high schools, with some special rules pertaining only to junior high students. On July 1, 1975, Part I of the rules, which applies to all students, provided:
 
 
 11
 Boys teams must be composed of boys only IN ALL CONTACT SPORTS. (Football, wrestling, ice hockey, soccer, basketball, and baseball)
 
 
 12
 Rule I, § 2. A footnote to the rule stated that it was intended to comply with decisions of this Circuit. After it was brought to the Association's attention that its rules might also not comply with Title IX, they were redrafted and reissued on July 1, 1976, for the sole articulated purpose of complying with Title IX. The boys and girls sections were combined, and several other significant changes were made, including the following:
 
 
 13
 In all contact sports (Football, Wrestling, Ice Hockey and Basketball) team members shall be boys only.
 
 
 14
 Girls may play on a boys team in non-contact sports, if there is no girls team or if the overall opportunities for interscholastic competition is (sic) limited for girls.
 
 Rule I, § 6.[1]
 
 15
 Teams of the opposite sex shall not compete against each other in any interscholastic athletic contests.
 
 
 16
 Rule I, § 7.
 
 
 17
 The OHSAA argues that the changes brought their rules into compliance with Title IX and its regulations. The relevant regulation is 45 C.F.R. § 86.41:[2]
 
 
 18
 (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
 
 
 19
 (b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport
 
 
 20
 (c) Equal opportunity. A recipient which operates or sponsors interscholastic athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
 
 
 21
 (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes
 
 
 22
 A reading of the regulation discloses that Title IX requires measures to be taken which will provide equal athletic opportunity. Thus the entire regulation must be interpreted in light of that requirement. The first way this may be achieved is by providing coeducational sports. The regulation additionally permits separate teams in sports which require competitive selection but also requires measures to be taken to ensure equality for the excluded sex, including where necessary an opportunity to try out for the team. It also provides for separate teams in defined contact sports but does not clearly prohibit try-outs for a position on such a team by the excluded sex.
 
 
 23
 In its motion for summary judgment, Yellow Springs asked only that the District Court declare Rule I, § 6 of the OHSAA to be null and void and unenforceable. The motion did not request a declaration that the Title IX regulation was unconstitutional. Indeed the complaint and plaintiffs' reply to defendants' motion to dismiss or for a more definite statement assert that the OHSAA rule violates the regulation. The plaintiffs argued that § 86.41 of Title IX's regulations offers an optional approach to recipients of aid, who may sponsor either coeducational or separate teams in contact sports as long as equal athletic opportunity is provided. It was the contention of Yellow Springs that § 86.41 should be read as saying:
 
 
 24
 (M)embers of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport (in which instance they may be prohibited from participating provided the recipient makes available via other acceptable means equal athletic opportunities).
 
 
 25
 Yellow Springs argued that the OHSAA rule was mandatory and prohibitory, in that it prevents its member schools from adopting the many means Title IX offers for achieving compliance. The OHSAA replied in its motion for summary judgment: "Section 86.41(b) permits separate teams for contact sports, but that is not a requirement. It is strictly permissive because much more is considered in the question of 'equal athletic opportunity for members of both sexes.' " The parties are thus in basic agreement that the regulations under Title IX do not proscribe girls' competing on the same team with boys in contact sports but instead provide for a permissive approach as long as the goal of equal athletic opportunity is achieved. The only issue then is whether the OHSAA may, without unlawful discrimination, frame its rules in a manner which limits recipients to providing only single-sex teams in contact sports and eliminates options which may be necessary for achieving the goal of equal educational opportunities. All the parties agree that the OHSAA rules must comply with 45 C.F.R. § 86.41(b), (c).
 
 
 26
 The trial judge assumed without examination that the OHSAA rule and the Title IX regulation were identical and proceeded immediately to consider the constitutionality of the regulation, ultimately holding it unconstitutional as a violation of substantive due process. However, they are not identical, and a careful inquiry discloses that the rules of the OHSAA do not comply with the regulation. Although the rules provide that girls may play on the boy's team in non-contact sports in language that tracks the regulation, the OHSAA rule for contact sports has been interpreted and applied to prohibit girls from participating on a boys' team in any contact sport at all levels under its jurisdiction. It conflicts in this regard with Title IX, which is purposely permissive and flexible on this point, rather than mandatory. See Note, Sex Discrimination and Intercollegiate Athletics: Putting Some Muscle on Title IX, 88 Yale L.J. 1254, 1269-72 (1979). The rule violates Title IX in that the recipient is provided no mechanism for achieving equal athletic opportunity. The rule thus operates to take away the discretion Title IX mandates be given recipient schools to determine how best to provide equal athletic opportunity and in some instances, such as here, may even prevent them from doing so. Insofar as the OHSAA rules are more restrictive than 45 C.F.R. § 86.41 and operate to prevent compliance with Title IX, they should be enjoined.[3]
 
 
 27
 The OHSAA might ask why, if Title IX grants a measure of discretion to recipients, that discretion may not be further delegated to the OHSAA to determine how best to implement Title IX. The simple answer is that the focus of both Title IX and the regulations is on "recipients." It is federal aid to "recipients" that will be cut off if Title IX is not complied with. "Recipients" bear ultimate responsibility for providing an equal educational opportunity. The OHSAA is not a "recipient," and does not bear the burden of non-compliance, so may not adopt a rule which limits the ability of recipients to furnish girls the same athletic opportunities it provides for boys. The OHSAA has not claimed that it attempted to frame rules with an eye to achieving the goal of universally applicable equal athletic opportunity. Thus, based on this record, we conclude that the determination as to compliance with Title IX must be made by individual schools, not the OHSAA.
 
 
 28
 There was testimony in this case that at the middle school level students of both sexes are of approximately the same skill level and size, with much greater differences appearing within sexes than between them. See National Organization For Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33 (1974). In the case before the court, in which the girls were physically able to play as equals, in which the school sought to promote coed activities generally, and in which a girls' team had no opportunity for equal competition for lack of girls' teams at other schools, coeducational teams can further the goals of Title IX. At other schools or at other levels where there are greater average physical differences between sexes this same goal may be better achieved with separate teams.
 
 
 29
 Congress passed Title IX in the face of longstanding sexual stereotypes that led educational institutions to make arbitrary distinctions. Thus, an overriding purpose of the statute was to determine the nature of equality for men and women in contexts in which their differences are particularly relevant.
 
 
 30
 Note, supra, 88 Yale L.J. at 1263; see Hoover v. Meiklejohn, 430 F.Supp. 164, 166 (D.Colo.1977) (dealing with the physical differences between males and females). We merely observe that such differences may not be presumed to exist where they do not in fact exist to serve as a basis for a broad, gender-based difference in treatment. Craig v. Boren, 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976).
 
 
 31
 To hold that a recipient of federal aid may let girls at the middle school level compete on the same team with boys, if this furthers the goal of equal athletic opportunity, is not to hold that all teams must be coeducational at all levels or to imply that Title IX's regulation must be held unconstitutional for expressly permitting separate teams.[4] In Title IX, Congress struck a balance between the needs of the individual athlete and the group and determined that for purposes of the statute equality is to be measured by the opportunities offered to the group, Note, supra, 88 Yale L.J. at 1265, not by the makeup of any individual team. It may have once been that requiring the superior female athlete to play on the girls' or women's team was to remove all possibility of developing her skills to the highest level attainable. However, with the advent of Title IX, it may be that required participation on the female team is not always unequal treatment. Indeed, with more attention being paid to women's sports in general and with a nearer approach to equality as provided in 45 C.F.R. § 86.41(c), the opportunities for the outstanding female athlete to excel are enhanced. Separate teams may to a large extent aid in this equalization not only because they provide more opportunities but also because they make monitoring of the opportunities provided easier.
 
 
 32
 Our understanding of what constitutes unconstitutional discrimination on the basis of sex has become more sophisticated through the years as a result of repeated scrutiny by the courts. The Supreme Court has now clearly held that in most cases of alleged sex discrimination it is equal protection which provides the standard for judicial scrutiny, Craig v. Boren, 429 U.S. at 197, 97 S.Ct. at 456, not due process. A regulation that discriminates may not be upheld where sex is not a legitimate, accurate proxy for existing differences. Id. at 204, 97 S.Ct. at 460. Once a law is found to make a distinction on the basis of sex, the burden shifts to the defendants to prove the rule bears a fair and substantial relationship to an important state objective. See e. g., id. at 197-204, 97 S.Ct. at 456-460. However, in order to measure equal opportunity, present relevant differences cannot be ignored. When males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist. See Caban v. Mohammed, 441 U.S. 380, 398, 99 S.Ct. 1760, 1771, 60 L.Ed.2d 297 (1979) (Stewart, J., dissenting). When considering the constitutionality of Title IX and its regulations, a blanket requirement of one team at each age level might result in male dominance of all teams and cause a return to pre-Title IX conditions, a result completely at variance with the statute's purpose. Cf. United Steelworkers of America v. Weber, 443 U.S. 193, 202, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979). It is desirable to maximize the opportunities for individual women, but a requirement that boys play only on boys' teams while girls may compete either with the boys or in an all-girls' program (as they wish) might have a similar undesirable effect on the fledgling women's athletic programs; women's athletics may be significantly harmed if the best female competition is lost to the boys' program.
 
 
 33
 Although the District Judge held § 86.41 unconstitutional, no party urged that position and no evidence was offered on that issue. The appellees do not ask for such a declaration here. The Department of Health, Education, and Welfare, which promulgated the regulation, is not a party to this lawsuit. The District Court suggested some arguments for and against its constitutionality. However, that discussion was not necessary to the question before it, and we believe it inappropriate for this court to make any ruling on the matter at this time on a motion for summary judgment. The issue can only be properly resolved upon a complete record and a full presentation of all views. As the dissent repeatedly makes clear, the present record is wholly inadequate to answer the difficult questions raised by the constitutional issue. Thus, even were we to agree with the dissent that it is necessary to reach the constitutional issue, we would not decide it with this case in its present posture. An abstract determination of whether unidentified students are denied equal athletic opportunity could cause a result repugnant to the statute's purpose and unnecessary under the Constitution. Permitting recipients to exercise their discretion to the extent permitted by the regulation is more likely to bring about the statute's goal of equal athletic opportunity. Title IX itself aids recipients in this through the regulations which interpret its purpose and set out a reasonable test for compliance with the law.
 
 
 34
 Accordingly, for the reasons stated above, we reverse the judgment of the District Court which held that 45 C.F.R. § 86.41 is unconstitutional. Appellees are entitled, however, to an injunction enjoining the OHSAA from enforcing Association Rule I § 6. We remand to the District Court for further proceedings consistent with this opinion and particularly for a determination of whether the state defendants are proper parties to be enjoined. Costs are awarded to plaintiffs-appellees against appellant the OHSAA.
 
 
 35
 NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.
 
 
 36
 In my view, the constitutionality of OHSAA Rule 1, § 6 denying the Yellow Springs school district the opportunity to allow its female middle school students to play on the presently all-male interscholastic basketball team is plainly raised and must be decided. All parties did raise and argue this constitutional issue in their summary judgment motions submitted to the district court. The case cannot be fully or satisfactorily resolved on the basis of Title IX, 20 U.S.C. § 1681 et seq., or its implementing regulation, 45 C.F.R. § 86.41. I would hold that OHSAA Rule 1, § 6 violates the equal protection clause of the Fifth and Fourteenth Amendments.
 
 I. Summary Judgment
 
 37
 Contrary to the majority opinion, I read the parties' summary judgment motions as raising and arguing the constitutionality of OHSAA Rule 1, § 6. The plaintiffs' memorandum in support of their summary judgment motion begins: "This is an action for declaratory and injunctive relief brought pursuant to 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983; 20 U.S.C. § 1681, et seq., and the Fourteenth Amendment to the United States Constitution." (emphasis added). The opening paragraph then continues:
 
 
 38
 Plaintiffs assert that the OHSAA's enforcement of Part I, Rule 1, § 6 has forced or is forcing them to violate both the Constitution and laws of the United States by requiring them to deny equal educational opportunities to female students solely because of the students' sex. As such, the enforcement of the rules and regulations of the O.H.S.A.A. conflicts with the Constitution and laws of the United States. (Footnote deleted).
 
 
 39
 Plaintiffs stated the issue of the case to be:
 
 
 40
 Plaintiffs believe that they should have the right, after considering their athletic program as a whole and considering the mandates of the United States Constitution and Title IX, to determine whether or not Amy Underwood and Leah Wing (or any other girl), should be allowed to participate on an athletic team with boys, or whether compliance with Federal law should be achieved through some other means. This decision should not, as it currently does, repose solely with the Ohio High School Athletic Association.
 
 
 41
 Plaintiffs then argued that the OHSAA rule conflicts with both the Title IX regulations and the Fourteenth Amendment.
 
 
 42
 In its cross motion for summary judgment, OHSAA argued first that its regulation comported with the Title IX regulations. Then OHSAA contended that "Part I, Rule 1, of the OHSAA rules and regulations does not deny to plaintiffs and students Fourteenth Amendment rights." OHSAA argued that the equal protection clause permits the separate classification of females in contact sports, since it bears a rational relationship to a legitimate government objective. Plaintiffs responded, in their reply brief:
 
 
 43
 Defendants further assert that their rule is constitutionally valid and, citing to Carnes v. Tennessee Secondary School Athletic Association, 415 F.Supp. 569 (N.D.Tenn.1976), argue that this Court should sustain the rule if it bears "a rational relationship to a legitimate state purpose." (Defendant's Memorandum at page 5). However, the Defendant has failed to establish any purpose for the questioned rule and has failed to carry the burden of establishing any relationship between the rule and a legitimate state purpose.
 
 
 44
 Thus, OHSAA's burden to justify its rule was raised and argued.
 
 
 45
 Similarly, the state defendants stated in the opening sentence of their memorandum in support of their summary judgment motion that plaintiffs raised a constitutional question. These defendants argued that the OHSAA rule did not violate Title IX, its regulations, or the Fourteenth Amendment.
 
 
 46
 Despite their recognition of the Constitutional issue, the defendants presented no evidence to demonstrate the substantial relationship between the OHSAA rule and important and substantial government objectives. Because the stipulated facts established plaintiffs' prima facie case of discrimination, to avoid or defeat summary judgment, the defendants had to produce evidence to contradict plaintiffs' prima facie case or to establish a defense. Smith v. Hudson, 600 F.2d 60, 65 (6th Cir. 1979). Defendants did neither, but instead sought summary judgment on the basis of the stipulation of facts. Defendants' failure to introduce any evidence as to the purpose of the OHSAA rule has left the record barren of any justification for it. Consequently, summary judgment in favor of plaintiffs on the constitutional issue was plainly proper, if the constitutional question must be reached.
 
 II. Title IX and Its Regulations
 
 47
 In accordance with the well established rules of judicial restraint, this case must be resolved, if possible, on the basis of Title IX or its regulations without addressing the constitutional issue. Ashwander v. TVA, 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). However, I conclude that the constitutional question is squarely raised and must be decided.
 
 A. § 86.41
 
 48
 The initial inquiry is whether the application of OHSAA Rule 1, § 6 to prohibit the two Morgan Middle School girls from playing on the varsity basketball team contravened 45 C.F.R. § 86.41. The short answer is that Yellow Springs' compliance with the OHSAA rule did not violate § 86.41, because this regulation did not become effective until July 21, 1975. 45 C.F.R. § 86.1. Therefore, in November, 1974, when Morgan Middle School forbade the two female athletes from playing on the boys' basketball team, and in January 1975, when it formed a separate girls' basketball team, § 86.41 had no effect. This denial provides the sole actual and concrete controversy before the court. Consequently, the lawfulness of Rule 1, § 6 at that time must be judged against Title IX and, if necessary, the Constitution.
 
 B. Title IX
 
 49
 Title IX prohibits discrimination on the basis of sex in any educational programs receiving federal funds, except for stated exemptions. It reads, in part:
 
 
 50
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance
 
 
 51
 A list of nine exceptions follows, including religious schools, historically single sex schools, military schools, social fraternities and sororities, and beauty pageants. Educational programs include interscholastic athletics. 120 Cong.Rec.S. 15292, 15323 (May 20, 1974) (Sen. Percy and Sen. Tower); Education Amendments of 1974, Pub.L.No.93-380, § 844, 88 Stat. 612 (1974); 40 Fed.Reg. 24128 (June 4, 1975). Morgan Middle School, as a recipient of federal funds which are used in part to finance its interscholastic athletic program, must comply with Title IX.
 
 
 52
 Congress did not expressly exempt contact sports programs from the prohibition of Title IX. Nevertheless, I conclude that Congress did not intend to proscribe separate sex teams in contact sports. First, unlike Title VI, 42 U.S.C. § 2000d et seq., Congress included many exceptions to the general prohibition against discrimination on the basis of sex in educational programs. Thus, Congress never intended a total ban on sex classifications in educational programs. Instead, Congress recognized the value or legacy of sex classifications in certain limited contexts.
 
 
 53
 The legislative history on the application of Title IX to athletic programs is scanty. However, the intent of Congress not to prohibit separate teams in contact sports does appear. Senator Bayh, the sponsor of the amendment to include the prohibition against sex discrimination, stated, in response to a series of clarifying questions asked by Senator Dominick, that his amendment would not require the "desegregation of football fields." 117 Cong.Rec.S. 30407 (August 6, 1971).[1] In contrast, Senator Bayh declared, in answer to a question from Senator Thurmond, that his amendment would require the admission of women into military academies. 117 Cong.Rec.S. 30409 (August 6, 1971). On the motion of Senator Thurmond, the Senate ruled the amendment not germane. 117 Cong.Rec.S. 30413, 30415 (August 6, 1971). When the Bayh amendment was reintroduced the following year, an express exception for military academies had been added. The contrast between the absence of an express exception for contact sports and the exception for military academies in Title IX is explained by Senator Bayh's assurance on the Senate floor that Title IX would not prohibit separate sex teams in contact sports. The 1974 amendment to Title IX, which expressly authorizes a consideration of differences between female and male intercollegiate athletic programs, bolsters this reading of Congressional intent. Pub.L.No.93-380, § 844, 88 Stat. 612 (1974).
 
 
 54
 Congress' inaction in modifying the Title IX regulations lends further support to my conclusion. NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974). Congressional silence is particularly telling in light of the legislative veto power, effective as of August 21, 1974, over the Title IX regulations. 20 U.S.C. § 1232(d), (f). The proposed regulations implementing Title IX were published shortly before the 1974 amendment. These regulations permitted separate sex teams when the team members were selected by competitive skill. The 1974 amendment did not overturn HEW's interpretation of Title IX. Similarly, the 1976 amendments to Title IX did not modify the final HEW regulations, which permitted separate sex teams in contact sports. Nor has Congress acted at any time since then to change HEW's interpretation of Title IX. Therefore, Title IX does not prohibit the exclusion of female athletes from male interscholastic teams in contact sports. Consequently, OHSAA Rule 1, § 6 is consistent with Title IX.
 
 
 55
 Finding no violation of Title IX or its regulations, I must address the constitutionality of OHSAA Rule 1, § 6.[2]
 
 III. Fourteenth Amendment and The OHSAA Rule
 A. State Action
 
 56
 I concur with the majority's holding on state action. The facts demonstrate the multiple linkages and interdependencies between the State and OHSAA. It is apparent that the State permits and encourages OHSAA to regulate interscholastic athletics. OHSAA's authority to sanction member schools for noncompliance with its rules and to regulate members' participation in competition not sponsored by it permits, in the district court's words, "a technically nongovernmental entity to dictate terms to a State entity." OHSAA plays an important role in public and private education in Ohio, performing a function which the State would otherwise be compelled to undertake. OHSAA thus operates with the implicit, and at times explicit, imprimatur of the State. Numerous decisions have found state action on similar facts. E. g., Fortin v. Darlington Little League, 514 F.2d 344 (1st Cir. 1975); Brenden v. Independent School District 742, 477 F.2d 1292 (8th Cir. 1973). The State's relationship to OHSAA is a classic example of a symbiotic relationship, which compels a finding of state action. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Therefore, state action has been established.
 
 B. Due Process
 
 57
 Declaring that the female students had a liberty interest in freedom of choice in matters of education, the district court held that the OHSAA rule created an irrebuttable presumption depriving them of liberty without due process of law. Defendants were enjoined from enforcing Rule 1, § 6; from enforcing or promulgating any rule which "bars physically qualified girls from participating with boys in interscholastic contact sports;" and from penalizing Yellow Springs for allowing female athletes to play on the basketball team.
 
 
 58
 Though, in my view, the district court did not err in its analysis, I prefer not to rest my opinion on due process principles. Most other courts, which have addressed similar issues, have reasoned on the basis of equal protection principles. Furthermore, the irrebuttable presumption reasoning of the Supreme Court in Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and other cases has frequently been criticized and its viability has been questioned. Clayborne v. Califano, 603 F.2d 372 (2d Cir. 1979); Trafelet v. Thompson, 594 F.2d 623 (7th Cir. 1979). The Supreme Court has rejected the irrebuttable presumption analysis in a few cases, Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and has not mentioned it in other cases where it is arguably relevant, Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). However, the Supreme Court has invoked the rule after Salfi, in Turner v. Board of Employment Security, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1977), and has decided more recently not to decide the issue of its continued vitality. Elkins v. Moreno, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). Therefore, I turn to consider how the OHSAA rule fares under the equal protection clause.
 
 C. Equal Protection
 
 59
 The constitutional question in this case has two parts. First, did the OHSAA rule violate the Fourteenth Amendment in the autumn of 1974 when it deprived Yellow Springs of the opportunity to allow two female middle school athletes to play on the interscholastic basketball team? Second, if so, did the creation of a separate but equal basketball team for the female athletes provide a sufficient remedy for the constitutional violation?
 
 
 60
 The OHSAA rule must foster an important government objective and be substantially related to that objective in order to withstand scrutiny under the equal protection clause. Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The rule is presumed to be valid. Robinson v. Board of Regents of Eastern Kentucky University, 475 F.2d 707 (6th Cir. 1973), cert. denied, 416 U.S. 982, 94 S.Ct. 2382, 40 L.Ed.2d 758 (1974).[3] However, the rule may not be premised on archaic stereotypes or generalizations about the role of women. Defendants contend that the rule fulfills two important goals: protecting the safety of female athletes and promoting the full participation of females in sports.
 
 
 61
 This court has not yet addressed the issue of whether a rule providing for separate basketball teams violates the equal protection clause. In Cape v. Tennessee Secondary School Athletic Ass'n, 563 F.2d 793 (6th Cir. 1977) (per curiam), the court held that the equal protection clause did not prohibit different basketball rules for females than males. For the purpose of the case, the court assumed that separate basketball teams were constitutional. No evidence of intentional sex discrimination or of discrimination in services and facilities was found.
 
 
 62
 In Morris v. Michigan State Board of Education, 472 F.2d 1207 (6th Cir. 1973), this court affirmed a preliminary injunction which struck down a Michigan High School Athletic Association rule prohibiting female students from competing on the high school tennis team, a noncontact sport. Because the language of the injunction could be read to enjoin the application of the rule to contact sports as well as noncontact sports, and because only a noncontact sport was in controversy, the injunction was modified to cover only noncontact sports. Hence, this court specifically reserved the question of separate teams in contact sports.
 
 
 63
 Despite the dearth of helpful precedent in our circuit, several other courts have confronted equal protection attacks on rules in contact sports. In Fortin v. Darlington Little League, 514 F.2d 344 (1st Cir. 1975), the court held narrowly that 8 to 12-year old girls must be allowed to play little league baseball. The defendants' justification of safety could not save the "boys-only" rule, because boys of all physical condition were permitted to play. Also, the evidence did not support a finding of material physical differences between boys and girls of that age.
 
 
 64
 Two district courts in this Circuit have addressed the question of female participation on "male teams" in contact sports. In Carnes v. Tennessee Secondary School Athletic Ass'n, 415 F.Supp. 569 (E.D.Tenn.1976), a preliminary injunction issued against the enforcement of a rule prohibiting high school women from playing varsity baseball. The Association's rationale of safety was held to be insubstantial, as men highly prone to injury could play. A second justification of protecting female sports teams from male intrusion was found not applicable, because the high school did not have a women's baseball team. Questioning the reasonableness of classifying baseball as a contact sport, the district judge assumed that the sexes could be separate for contact sports.
 
 
 65
 In Clinton v. Nagy, 411 F.Supp. 1396 (N.D.Ohio 1974), the district court granted a temporary restraining order against a rule of the Cleveland Brown's Muny Football League which prohibited girls from playing. The district judge emphasized that defendants had not presented any evidence showing that the plaintiff herself was physically incapable of playing football against boys.
 
 
 66
 Other district courts have considered the issue at hand in a very thoughtful fashion. In Leffel v. Wisconsin Interscholastic Ass'n, 444 F.Supp. 1117 (E.D.Wis.1978), the district court held unconstitutional an Association rule prohibiting coed teams in high school. The high school did not have separate female teams in baseball and tennis. There was a separate female swimming team. The district court held that female athletes must be allowed to compete for positions on the varsity team where there is no separate female team. The district court declared that a school cannot absolutely deny females the opportunity to compete in contact sports when males have that opportunity. Finding that the plaintiffs did not allege that defendants intentionally imposed different levels of competition between male and female teams in the same sport, the district court also ruled that plaintiffs' claim did not raise the issue of different levels of competition. Further, the district court held that plaintiffs' demand for relief was satisfied by separate female programs providing comparable facilities. Therefore, it did not address the issue of whether the maintaining of separate female teams violates the equal protection clause.
 
 
 67
 In Hoover v. Meiklejohn, 430 F.Supp. 164 (D.Colo.1977), the district court struck down a Colorado High School Activities Association rule which prohibited high school women from participating in soccer, a contact sport. The state justification of safety was discredited because physical criteria for playing had not been established for men. The district court also noted that the range of different physical ability among individuals of both sexes was greater than the average difference between the sexes. The district court called the rule simply "patronizing protection" for women. However, the district court, in discussing a remedy, determined that a "separate but equal" female program in soccer would suffice. It distinguished Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), stating that confining the female athletes to separate programs would not stigmatize them. However, since both parties agreed that "separate but equal" teams were constitutionally sufficient and were the best remedy for the female athletes, the district court did not expressly decide the constitutional validity of "separate but equal" teams.
 
 
 68
 One other court has discussed extensively the equal protection question in the context of noncontact sports. In Brenden v. Independent School District 742, supra, the Eighth Circuit held unconstitutional a Minnesota State High School League rule barring female students from competing with male students in tennis, cross-country skiing, and cross-country running. The high school did not have female teams in these sports and both plaintiffs were excellent athletes who were able to compete against males in these sports. The League argued that the rule served to ensure that persons with similar qualifications competed and that physical differences made it impossible for males and females to compete equally. The Eighth Circuit found no basis in the record for the League's assumption and declared that generalizations would not suffice to deny qualified individuals the opportunity to compete. Also, any adverse effect on female opportunities in sports resulting from the invalidation of the rule was found too speculative to justify the rule.[4]
 
 
 69
 As noted earlier, the defendants proffer two government objectives for the OHSAA rule: protecting the safety of female athletes and promoting the full participation of women in sports. I assume that these objectives are legitimate and important.[5] However, the means chosen to implement these goals, the OHSAA rule, is not substantially related to them. As discussed above, the courts have strongly and uniformly rejected both justifications where a separate female team has not been provided. OHSAA has not offered any evidence in support of its justifications.
 
 
 70
 The safety rationale is not persuasive. Though not all females may have the skills, strength, and stamina to compete with males in contact sports, some females, like the two middle school girls in Yellow Springs, do have the physical ability. Their ability was proven on the basketball court when they competed for positions on the team. Since the physical ability of athletes to play on interscholastic teams is determined on the basis of individual tryouts, there is no reason to use sex as a proxy for physical ability. Orr v. Orr, 440 U.S. at 280-82, 99 S.Ct. at 1112-13. Testimony in the record shows that middle school students of both sexes are approximately the same size and have the same skills, with much greater differences showing within the sexes than between them. Furthermore, OHSAA apparently has not issued criteria governing the physical condition of males to play basketball. Thus any male student, regardless of physical condition, is allowed to compete. In the complete absence of record evidence supporting the safety justification, I would not hold that the OHSAA rule is substantially related to that objective.
 
 
 71
 The second objective of promoting the full participation of women in sports is patently not served when female athletes are denied any opportunity to play basketball. In the context of an opportunity to play on a separate female team, this objective actually contains three arguments. The first argument is that allowing the top female athletes to play on the "male team" would significantly harm the female athletic program. The second contention is that, if females are permitted to play on male teams, then males must be allowed to play on female teams. The result, it is argued, would be male dominance in female sports programs, denying women any opportunity to compete in interscholastic sports. The third argument is that schools will cut back on female athletic programs by fielding just one "open team" in each sport.
 
 
 72
 Defendants' arguments are not supported at all in the record.[6] Their first argument rests on sheer speculation. Plaintiffs could as easily contend that the participation of top female athletes with men will enhance the reputation and glamour of female athletics and encourage more women to participate. Plaintiffs might say that, though a team may lose its top player, the overall effect on the program would be positive, by calling attention to the abilities of female athletes and consequently raising fan interest and funding. Of course, neither speculation is accepted as fact.
 
 
 73
 Similarly the record does not support a finding that enjoining enforcement of the OHSAA rule will result in male domination of female sports programs. No court has adopted the Association's reasoning. One district court has opined, relying on Califano v. Webster, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), that separate and exclusive female teams are constitutionally permissible, so that women would have the choice of competing on an "open team" or a single-sex female team. Gomes v. Rhode Island Interscholastic League, 469 F.Supp. 659 (D.R.I.), vacated and dismissed as moot at the time of appeal, 604 F.2d 733 (1st Cir. 1979). See also Petrie v. Illinois High School Ass'n, 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979). But see Attorney General v. Massachusetts Interscholastic Athletic Ass'n, 393 N.E.2d 284 (Mass.1979). It reasoned that the Constitution permits compensatory benefits to correct past discrimination, but does not permit the use of overbroad rules based on archaic stereotypes. See Note, Sex Discrimination and Intercollegiate Athletes: Putting Some Muscle on Title IX, 88 Yale L.J. 1254, 1274 (1979); T. Cox, Intercollegiate Athletics and Title IX, 46 Geo.Wash.L.Rev. 34, 55, 59 (1977). Of course, I do not express an opinion on the right of male athletes to play on female teams, since this issue is not in controversy. My discussion is aimed only at illustrating the large extent to which the defendants' second justification rests on speculation.[7]
 
 
 74
 The record indicates that Yellow Springs is fully committed to developing a sports program for its female athletes. Not a shred of evidence suggests that Yellow Springs would use a ruling permitting mixed sex teams to cut back on its program for female athletes. Moreover, Title IX, as implemented in 45 C.F.R. § 86.41(c), mandates each school to provide an equal opportunity for women to participate in sports. 44 Fed.Reg. 71413 (1979) (Policy Interpretation of § 86.41(c)). See Cox, supra at 44-45. Cf. 45 C.F.R. § 80.3(b) (Title VI regulations on affirmative action). OHSAA recognizes that an equal opportunity is not offered if one open team is organized in each sport and the female players are not capable of making the team.
 
 
 75
 I would hold that the defendants have not demonstrated that the OHSAA rule is substantially related to either proffered government objective. Therefore, the two female basketball players were entitled under the equal protection clause to play on the "male" interscholastic basketball team in November, 1974, when Morgan Middle School did not have a female interscholastic basketball team. The OHSAA rule violated the Constitution by prohibiting Yellow Springs from affording these players that opportunity.
 
 
 76
 Yellow Springs formed a female interscholastic basketball team in January, 1975. Consequently, the question of whether organizing this separate team was an adequate remedy for the constitutional violation arises. The cases discussed above settle that the equal protection clause requires at least an equal opportunity for female athletes to play any contact sport, once a school decides to offer that sport. No facts in the record provide a basis for determining the comparability of the female interscholastic basketball program at Morgan Middle School to the male program in, for example, coaching, facilities, uniforms, funding, or schedules. Ordinarily, defendants would bear the burden of proving that the separate programs were equal. Because plaintiffs request an order permitting them to put female players on the all-male interscholastic team, the equality of the male and female programs is inconsequential. I will assume that the two programs are equal. Therefore, the issue for resolution is plainly posed: does the equal protection clause prohibit an association from denying qualified female athletes the opportunity of playing on the varsity team in contact sports, when the school offers a "separate but equal" program for female athletes in those sports? I conclude that the equal protection clause requires schools to give qualified female competitors the opportunity to play on the "male" interscholastic varsity team.
 
 
 77
 The defendants' justifications for their rule requiring separate teams in contact sports are totally unsupported in the record. Therefore, to reach my conclusion that the "separate but equal" basketball program at Morgan Middle School contravenes the equal protection clause, I only need to find a constitutional harm in offering separate sports programs.
 
 
 78
 Two district courts have expressed in dicta or assumed the conclusion that "separate but equal" programs are constitutionally sufficient. In Leffel v. Wisconsin Interscholastic Ass'n, supra, the district court held that plaintiffs must allege that defendants intentionally imposed different levels of competition on the male and female teams in order to state a claim. In Hoover v. Meiklejohn, supra, the district court distinguished Brown v. Board of Education, supra, and declared that female athletes would not suffer a stigma by being restricted to separate teams. I decline to follow the reasoning or assumed result of either district court.
 
 
 79
 In my view, the question is whether or not separate teams will provide female athletes with an equal opportunity to compete in sports. The focus must be placed on the quality of the competitive experience. The indisputable fact is the quality of competition among some male interscholastic teams is higher than among some female interscholastic teams. The two female basketball players at Morgan Middle School decided that they could best develop their skills by playing on the "boys team." By requiring separate male and female teams, the defendants have imposed a lower level of competition upon female athletes. Though many female athletes will gain a very beneficial experience in competing on a separate female team against other female teams, in our case the female athletes will not be sufficiently challenged by the lower level of competition. Top female athletes need to compete on the best interscholastic team in order to achieve their peak performance. When female athletes are denied this opportunity by being restricted to a lower level of competition, equal opportunity is not provided.[8] See Commonwealth v. Pennsylvania Interscholastic Athletic Ass'n, 18 Pa.Cmwlth. 45, 334 A.2d 839, 842 (1975) (decided according to Pennsylvania Constitution). The equal protection clause demands that female athletes not be denied the opportunity to play on the best interscholastic team simply because of their sex.[9] An individualized determination of a female athlete's ability is required.
 
 
 80
 Contrary to Hoover, I believe a stigma may attach when qualified female athletes are not allowed to compete on teams with male athletes solely because they are female. See Brenden v. Independent School District 742, 477 F.2d at 1296-97. See also Commonwealth v. Pennsylvania Interscholastic Athletic Ass'n, 334 A.2d at 842; 117 Cong.Rec.S. 30403, 30405 (August 6, 1971) (remarks of Sen. Bayh and report of President's Task Force on Women's Rights and Responsibilities). The separation could characterize female athletes as less able, less aggressive, and more fragile in a word, inferior to male athletes. See 118 Cong.Rec.S. 5804-08 (remarks of Sen. Bayh); Note, supra at 1265-67. This characterization would be the sort of archaic and harmful stereotype which the equal protection clause forbids.
 
 
 81
 Sex, like race, is an immutable characteristic which bears no relationship to the actual ability of individual female athletes to compete in sports. Frontiero v. Richardson, 411 U.S. 677, 686-87, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (opinion of Brennan, J.). Also like black citizens, women have suffered from a long history of discrimination, necessitating the enactment of the Nineteenth Amendment and a number of remedial statutes. Id. at 684-85, 93 S.Ct. at 1769. The discrimination against women has extended into the sports area. Note, supra at 1254 n.4; Cox, supra at 34. Chapter I of a comprehensive history of sex discrimination in sports, which the United States Commission on Civil Rights recently published, is included as an Appendix to my opinion. United States Commission on Civil Rights, More Hurdles to Clear (1980) (Clearinghouse Publication No. 63). The Supreme Court's reasoning in Brown v. Board of Education, supra, may prove to be equally applicable to the intentional separation of female athletes from competition with male athletes:
 
 
 82
 To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.
 
 
 83
 347 U.S. at 494, 74 S.Ct. at 691. However, a decision on the stigma question must await a developed factual record and argument by the parties in another case.
 
 
 84
 Equal participation in sports by female athletes would be a major step in overcoming the outmoded notions of female roles still prevalent in our society. I cannot overlook the impact of education and athletics as "a principal instrument in awakening the child to cultural values, in preparing him (or her) for later professional training, and in helping him (or her) to adjust normally to his (or her) environment." Id. at 493, 74 S.Ct. at 691. Sex discrimination in sports is debilitating to the individual athlete whose development and career is stunted and to women as a whole who labor under the burden of traditional notions of their role in society.
 
 
 85
 Therefore, I would hold that restricting the female athletes to a "separate but equal" basketball program at Morgan Middle School transgresses their constitutional right to an equal opportunity to participate in sports. Further, I would hold that defendants have completely failed to demonstrate that the separation or classification required by the OHSAA rule is substantially related to an important government objective.
 
 D. State Defendants' Liability
 
 86
 The district court held that the State Board and its members, the State Superintendent, and Robert Holland were liable along with OHSAA for intentional sex discrimination in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. The district court used two alternative theories in finding the state defendants liable. It relied primarily on the rule best stated in Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969): Plaintiffs state a claim where "government officials have notice of the unconstitutional conduct of their subordinates and fail to prevent a recurrence of such misconduct." Accord, Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970) (dictum). The Second Circuit would allow a claim where the actions of the city employees were "authorized, sanctioned, or ratified by municipal officials." Turpin v. Mailet, 579 F.2d 152, 164 (2d Cir.) (en banc), vacated and remanded on other grounds, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), modified, 591 F.2d 426 (2d Cir. 1979) (en banc).
 
 
 87
 Both Schnell and Turpin involved lawsuits by private citizens against municipalities and municipal officials for alleged abuses by police officers. Because the rule of law stated in these cases turns on the superior-subordinate relationship and because the state defendants are not the superiors of OHSAA, which is a private voluntary association, or the employer supervisor of the Yellow Springs school district, the rule is not applicable in our case.
 
 
 88
 Relying on Bradley v. Milliken, 540 F.2d 229, 245 (6th Cir. 1976) (subsequent history deleted), the district court held in the alternative that the state defendants had "substantially contributed to the discrimination." It based this conclusion on its finding that OHSAA "revenue is contingent upon State consent to use public facilities to hold Association-sponsored tournaments."[10] The district court declared that "the State defendants could discontinue subsidizing Association activity either by refusing to permit the Association to hold tournaments at public facilities or establishing minimum athletic requirements and enforcing them under ORC § 3301.16."
 
 
 89
 The majority opinion states correctly the relevant inquiry. Contrary to the majority, however, I would hold that the record does establish the liability of the State defendants. Though the district court did not have the benefit of Penick, it used essentially the same reasoning and reached the correct result. The stipulations of facts provide the required fact-finding, making a remand unnecessary. We have the competency and the duty under the teaching of Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), to apply the facts in this case to the legal standards set forth in Penick.
 
 
 90
 Though the State Board does not exercise direct control over interscholastic athletic competition or OHSAA, a liaison between the State Department of Education and OHSAA has existed since the late 1920's or 1930's. Robert Holland, by virtue of his position with the Department of Education, sits as a nonvoting ex officio member on the OHSAA Board of Control. He testified that he regularly reports OHSAA rules and rule changes to officials of the State Department of Education. He suggested to OHSAA before the modification of Rule 1, § 6 that its rules might not comply with Title IX. Also, Holland views athletics as an important part of the educational experience. The State Board has the statutory duty of establishing, implementing and enforcing minimum educational standards. Until now it has not required schools to offer interscholastic athletic programs. Nevertheless, some state funds are used for the athletic programs. The State Board cooperates with OHSAA by providing information on a school's eligibility. The district court found that the State Board can indirectly control OHSAA policy by means of its financial leverage over the local school districts, representatives of which compose the OHSAA Board of Control. I would hold that this finding is not clearly erroneous.
 
 
 91
 The Penick standards have been met. The state defendants obviously knew of the OHSAA rule and its effect on the Yellow Springs school district, because of Holland's presence on the OHSAA Board of Control and the Yellow Springs' petition drive to change Rule 1, § 6. See also Answer of Defendants, Ohio High School Athletic Association, et al., to Plaintiffs' First Amended Complaint, p. 7, para. 64. Also, Holland suggested that the OHSAA rules be amended in order to comply with Title IX. The state defendants did not take any action against OHSAA or the local school members of OHSAA to protest or change the amended OHSAA rule. Obviously they believed the rule to be constitutional, as they so argue on appeal. See also Answer of State Defendants to Plaintiffs' First Amended Complaint, p. 7, para. 64; Answer of Defendants, Ohio High School Athletic Association, et al., to Plaintiffs' First Amended Complaint, p. 7, para. 65. The state defendants had the power to affect OHSAA rulemaking, through the voice of Holland and through control of the purse and educational requirements of local school districts.[11] In light of the fact that Holland had earlier persuaded OHSAA to modify its rules, I would find that the effect of the State defendants' acquiescence was that the OHSAA rule remained in effect and was enforced by the local schools. In short, the state defendants allowed OHSAA Rule 1, § 6 to remain effective by willingly cooperating with OHSAA, and promoting its program, despite knowledge of this OHSAA rule. Consequently, in my view, the state defendants must share liability.
 
 IV. Title IX Regulations
 
 92
 The district court held that 45 C.F.R. § 86.41(b) violated the Fifth Amendment "to the extent it authorizes recipients of federal aid to deny physically qualified girls the right to compete with boys in interscholastic contact sports." Plaintiffs did not directly attack the constitutionality of the federal regulation by naming the Secretary of Health, Education, and Welfare as a defendant. Instead, OHSAA and the members of its Board of Control raised their compliance with the Title IX regulation as a defense. I concur that the constitutionality of the Title IX regulation should not be decided on the present barren record and, therefore, that the district court's judgment on this question must be vacated.
 
 
 93
 Given my resolution of the constitutional question, it is not necessary to address the question of any conflict arising later in time between the Title IX regulations and the OHSAA rule on contact sports. However, I do concur with the majority's reasoning and conclusion that the mandatory separation required by the OHSAA rule does conflict with the permissive rule stated in the Title IX regulation. The constitutionality of Yellow Springs exercising its own judgment to establish "separate but equal" teams is not an issue on this appeal. My opinion provides guidance on the pertinent legal issue, but obviously no decision can be reached in the absence of an actual controversy or a factual record. On the basis of 45 C.F.R. § 86.6(c), I also concur in the majority's holding that the OHSAA rule cannot prohibit Yellow Springs from making the decision on how best to provide an equal opportunity to its female basketball players. I would not hold, on the present record, that OHSAA is not a "recipient" of federal funds and therefore need not comply with the Title IX regulations. The definition of "recipient" in the regulations includes any organization which has received federal funds passed through from its members. The record is not sufficiently developed to permit a decision on whether OHSAA is a "recipient" as defined in the HEW regulations.
 
 APPENDIX
 Chapter 1
 HISTORY OF WOMEN AND GIRLS IN ATHLETICS
 
 94
 The elimination of sex discrimination in American high school and college sports has become one of the Federal Government's goals as a result of the passage of Title IX of the Education Amendments of 1972. Sport has become a major social institution in America, but, as has been true with many other social institutions, women have not taken part on an equal basis with men.
 
 
 95
 The history of American women in sports begins in the mid-19th century.[1] Although girls and women have participated in sports ever since, it was not until recently that they were encouraged to do so. In the beginning they were thought too frail and weak for physical exercise; some years later, in the first quarter of this century, the enthusiasm of college women for team sports and competition was considered dangerous and unwomanly; more recently, the major obstacle to women's and girls' full participation in athletics in educational institutions has been the argument that it would cost too much.
 
 
 96
 Although record numbers of women and girls are in college and high school sports programs, their participation rates trail far behind those of men and boys, and the monies that are allotted to their programs are disproportionately small. To understand some of the forces that have operated and continue to operate to deny women and girls the opportunity to participate fully in sports, it is informative to begin with the Victorian era when the female sex was considered too weak and fragile to engage in sports or physical activity at all.
 
 Victorian Era
 
 97
 The ideal woman in the Victorian era was weak, fragile, and passive,[2] a person "on a pedestal somewhere above the realities of life."[3] Fashion designers, clergymen, physicians, and journalists joined in creating an image of femininity that was characterized by delicacy and even by poor health.[4] Clothing was exceptionally restrictive, with tightly laced corsets, bustles, hoops, and long trailing skirts. It is not surprising that women were easily prone to fainting. Betty Spears, a sports historian from Wellesley College, has noted, "Women were expected to remain indoors, and pursue such feminine pastimes as embroidery and painting on glass."[5] Obviously, this ideal was not applied to working class women or to minority women. As Betty Spears noted, "This upper-class image ignored sturdy farm girls, the workers who toiled long hours in the factories, and the average woman who kept house and raised a family."[6]
 
 
 98
 Although it was generally believed that most physical activity was too strenuous for women, both sexes occasionally participated together in such games and sports as archery, bowling, croquet, golf, and tennis. Since the skill level and effort were not high for either sex, these sports provided pleasant recreation for men and women.[7]
 
 
 99
 During the 1860s, women's colleges played a special role in developing women's sports.[8] There had been great resistance towards the idea of providing higher education for women, because it was believed that they were mentally and physically inferior to men and therefore unable to attend class on a regular basis. The founders of women's colleges encouraged young women to participate in vigorous exercise, on the theory that women could do college work only if it was balanced by physical activity. They also wanted to show the public that young women could engage in college work equal to that of young men.[9] At Vassar, for instance, physical activities included gymnastic exercises[10] as well as bowling, horseback riding, swimming, flower gardening, and ice skating. Because these activities proved to be a success, soon other women's colleges followed Vassar's lead.[11]
 
 
 100
 By the 1890s sports were recognized by both educators and students as producing the same physical results as gymnastic exercises,[12] and the team sports of basketball, volleyball, and field hockey were introduced. As women began to enjoy the excitement of these new team sports, their interest in gymnastic exercises declined further, and by the end of the decade, team sports played a prominent role in college physical education programs.[13]
 
 Women's and Girl' Athletics Since 1900
 
 101
 As women and girls began to participate in large numbers in competitive team sports, some physical educators disapproved because competition was not considered womanly.[14] After basketball became the most popular team sport for women and girls across the Nation, many physical educators became convinced that it would be injurious to the health of women if they continued to engage in competitive athletics. Their major worry was that women and girls would be pressured into playing during their menstrual period.[15] In 1924 one prominent physical educator reflected the opinion of her colleagues by saying, "They would be apt to get more physical straining than physical training."[16]
 
 
 102
 Physical educators were convinced that rough physical contact in competitive sports was more dangerous for women and girls than for boys and men.[17] Competitive athletics, although dangerous for men, were justifiable because they could develop manly strength. They could find no comparable justification for women's athletics because they did not consider the development of strength appropriate for women.[18]
 
 
 103
 Many physical educators also wanted to guard women's programs at high schools and colleges from the professionalization of men's intercollegiate athletic programs. Women's athletic programs, they said, should focus more on intramural competition such as field days, rally days, and class days, where the competition was not as vigorous.[19] Not wishing to follow the men's pattern of athletics, female physical educators created a new athletic philosophy for women based on securing "the greatest good to the greatest number." This philosophy has served as the underlying basis for women's athletic programs for the better part of this century.[20] They were also alarmed by the fact that few women or girls received health examinations,[21] that women athletes were wearing "questionable uniforms," and that they were allowed to travel unchaperoned.[22] Since many of these physical educators had worked hard over the years for high standards of conduct and sportsmanship for women, they began to fear that the woman athlete would be exploited.[23]
 
 
 104
 The solution to these problems appeared to be firm national regulation of women's athletics. Several women's athletic organizations were soon formed, but it was not long before the policies they developed resulted in decreased competitive opportunities for women and girls.
 
 
 105
 In 1917 the Athletic Conference of American College Women was formed at the University of Wisconsin,[24] but in 1920 the Association of Directors of Physical Education for College Women denounced women's intercollegiate athletics. Concerned about "commercialization and professionalization," they preferred "a broad program of activities" to specialized competition.[25]
 
 
 106
 In 1923, a Woman's Division of the National Amateur Athletics Federation was formed. It developed a philosophy sometimes referred to as the "creed" which "stressed sports opportunities for all girls, protection from exploitation, enjoyment of sports, female leadership, (and) medical examinations."[26]
 
 
 107
 The purpose of the creed was to promote athletic programs for all women and girls regardless of skill, instead of focusing on highly competitive athletics for only a few. Although the promoters of this philosophy assumed that their resolution would foster healthy athletic competition for all women and girls, it was interpreted as opposing competition.[27] Soon female competitive athletics began to decrease. The percentage of colleges sponsoring varsity competition for women throughout the country dropped from 22 percent in 1923 to 12 percent in 1931.[28] In place of competition, play days and sports days were organized. This philosophy of athletics for women and girls continued into the early 1960s.
 
 
 108
 Although there were few competitive athletics for girls and women at educational institutions during the depression and Second World War, by the end of the war, women were eager to participate. Once again, however, the idea that competition was "unladylike" constituted an obstacle.
 
 
 109
 Sports such as swimming, gymnastics, riding, skiing, and tennis were considered acceptable for women participants, but softball, basketball, and track were considered "unladylike," and the femininity of women who participated in them was questioned.[29] "The greatest good to the greatest number" slogan was revised to "a sport for every girl and every girl in a sport." This philosophy resulted in denying competition to the highly skilled woman athlete.[30]
 
 
 110
 While many women were still concerned about their "femininity" or were participating in recreation programs designed for all women but competitive for none, a few schools were interested in winning. Among the latter were two predominately black colleges. Female track stars from Tuskegee Institute won 13 outdoor and 4 indoor Amateur Athletic Union (AAU) championships between 1936 and 1951. Tennessee State University won 25 AAU championships beginning in 1955.[31] These two colleges were in large part responsible for the United States' fine showing in international track competition during these years. Tuskegee Institute has placed 6 women on Olympic track teams. Tennessee State has placed 29 women on Olympic teams, and they have won 11 gold, 4 silver, and 4 bronze medals. The two most famous Tennessee Tigerbelles are Wilma Rudolf who won 3 gold medals in the 1960 Olympics and Wyomia Tyus who is the only person male or female to win a gold medal in the 100 meter race in two successive Olympiads, 1964 and 1968.[32]
 
 
 111
 By the 1960s, competitive athletics for girls and women were looked upon more favorably than in the 1930s. The Division for Girls and Women's Sports (DGWS)[33] decided that it had been discriminating against the highly-skilled female athlete by forcing her out of the educational environment to gain competitive athletic experiences[34] and formed the Commission on Intercollegiate Athletics for Women, presently known as the Association for Intercollegiate Athletics for Women (AIAW), to provide "a framework for appropriate intercollegiate athletic opportunities for women."[35]
 
 Current Obstacles to Full Participation
 
 112
 In 1972 Congress passed Title IX of the Education Amendments of 1972, which states, "No person in the United States shall on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[36] On July 21, 1975, HEW adopted a regulation to implement Title IX,[37] and in September 1975, HEW transmitted a memorandum to chief State school officers, superintendents of local educational agencies, and college and university presidents explaining how Title IX applies to athletic programs.[38] Women and girls hoped that Title IX would quickly lead to increased opportunities.
 
 
 113
 Although physical educators have accepted the idea of competitive athletics for women and girls, and more women and girls are participating in competitive athletics than ever before, obstacles continue to exist. One major barrier that women athletes must face is sex stereotyping of sports, which apparently has grown out of the attitude that it is unfeminine for women to participate in them. A number of myths surround this attitude and its various manifestations people don't want to watch women play competitively, sports masculinize women, women cannot excel in sports for physiological reasons, women are not really interested in sports. The facts belie the myths.
 
 
 114
 Spectator interest has already been demonstrated with respect to women's and girls' sports. In the State of Iowa, for example, girls' high school athletics, particularly basketball, are followed as eagerly as boys' athletics. The 58th Annual State Girls Basketball Championship held in Des Moines in March 1977 attracted crowds totalling more than 100,000 and was televised over a nine-State area.[39]
 
 
 115
 Television has played a major role in generating spectator interest in sports, but until 1960 it largely ignored women's sports. Television first sparked real interest in women's sports with its coverage of the 1960 Rome Olympics. After that women's and girls' gymnastics and swimming competitions began to be featured on such programs as "Wide World of Sports."[40] Now women's sports are often seen on television and can be expected to result in increased spectator interest.
 
 
 116
 A second barrier to full participation by females in athletics is the idea that sports are a masculine activity. During the early childhood years, boys and girls are equally matched physically, and they often play together in rugged games and activities. As they approach puberty, however, such girls are frequently labeled "tomboys," and are led to believe that vigorous activity like climbing trees and playing ball is only for boys. By the age of 12, then, many girls have already given up the idea of playing in sports because of the negative connotations associated with being a "tomboy." Dr. Jack Wilmore, professor and head of the department of physical education and athletics at the University of Arizona, has argued that the decision to give up sports in favor of "a sedentary lifestyle" results in the deterioration of strength and muscular and cardiovascular endurance as well as in the accumulation of body fat.[41] An undetermined percentage of physical inequality between men and women results, Dr. Wilmore argues, from the "social or cultural restriction imposed on the female."[42] By becoming less active during their developing years, girls miss out on opportunities to increase their strength and improve their physical well-being, while their male counterparts are encouraged to remain physically active.
 
 
 117
 A variety of studies have demonstrated that female athletes are physically stronger, more muscular, and more flexible than women who are not athletes.[43] Having physical strength and flexibility, however, is not to be masculine. The adult female body contains only about half the muscle mass of the adult male body. Some of the male's greater muscle mass is due to the fact that men are taller than women, but even when size is held constant, females have only 80 percent of the strength of men.[44] In one study in which males and females undertook identical training, the males increased their muscular strength by 50 percent while the females increased theirs by only 24 percent.[45] More basic, however, is the association of strength with masculinity and weakness with feminity. The myth that sports will "masculinize" women derives from this Victorian association, and unfairly denies women robust good health.
 
 
 118
 Sports physiologists have demonstrated that women can play as actively as men, that Olympic athletes have competed and won at all stages of the menstrual cycle, and that exercise, if anything, is beneficial rather than harmful in alleviating menstrual complaints.[46] The effect of training and competition on the ease of childbirth is pronounced. A study of Olympic athletes showed that they delivered their babies 87.2 percent faster than established norms, with 50 percent fewer Caesarian sections than in normal populations.[47] Another study found that women with chronic fatigue and low back pain following pregnancy suffered primarily from the lack of physical activity dating from childhood and from poorly developed anterior abdominal musculature.[48]
 
 
 119
 The myth that girls and women are not really interested in sports appears to be supported by the low rates of participation compared with boys and men. Low participation rates, however, are more a reflection of lack of opportunity and fear of being thought "masculine" than lack of interest. Where opportunities are available and female athletes are rewarded, girls and women participate in large numbers. In Iowa, where high school girl athletes are idolized in the media and in the grandstands,[49] the percentage of athletes who are girls is higher than in any other State (48.8 percent).[50]
 
 
 120
 Women are also discouraged by discrimination in the allocation of facilities, equipment, practice schedules, and budgets. Facilities provided for women are often inferior to those provided for men. Commonly, their gymnasiums are smaller and less well-equipped.[51] In some cases, women have had to pay for their own equipment.[52] When women's teams and men's teams share facilities for practice or competition, women typically are scheduled around the men, for example, at 6:30 a. m. or during the dinner hour.[53] Boys have uniforms for each sport, while girls may have to make do with colored "pinnies" over their own gym clothes.[54]
 
 
 121
 The disproportionately low amount of money spent on female athletes compared with male athletes has become a widely used measure of discrimination or lack of equal opportunity. The results of an informal survey of colleges and high schools conducted by womenSports Magazine in 1974 showed that at the high school level boys' budgets, on the average, were five times larger than girls', while at the College level, men's athletic budgets were 30 times larger. In some universities the difference was 100 times as great.[55]
 
 
 122
 Although budgeting differences like these are no longer prevalent, colleges and high schools continue to spend much more for their male athletes than their female athletes. Girls and women have faced a variety of obstacles to full participation in athletics athletics were considered unwomanly, dangerous, and too expensive. Despite these obstacles, women and girls are participating in sports in greater numbers than ever before.
 
 
 
 [1]
 This Section indicates that girls may not play basketball at all in OHSAA schools, even on an all-girls team. However, another provision, Section 9 of Rule I, expressly permits girls to compete in basketball: "A high school girl may compete in the following: archery, badminton, basketball, " (emphasis added)
 
 
 [2]
 The dissent's analysis of Rule I, § 6 begins by stating that, since 45 C.F.R. § 86.41 was not in effect in 1974 when Yellow Springs first attempted to field a mixed basketball team, it is not relevant to this suit. This analysis overlooks the fact that Yellow Springs only seeks declaratory and injunctive relief against continued enforcement of the OHSAA rule, so the situation as it existed in 1974 is immaterial. When granting injunctive relief a court must consider the circumstances as they exist at the time relief is granted, not at the time of the conduct that led to the filing of a suit. Where injunctive or declaratory relief is at issue a law or regulation passed even after a decision by a district court must be given effect on appeal, since injunctive relief operates wholly in the future. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 464, 41 S.Ct. 172, 175, 65 L.Ed. 349 (1921); Rodgers v. United States, 158 F.Supp. 670, 680-681 (S.D.Cal.1958). The question this Court must decide is whether the OHSAA rule presently violates federal law
 
 
 [3]
 Contrary to the statement by the dissent, we do not claim that the constitutionality of Rule I, § 6 was not raised by the parties. We simply adhere to the wisdom of Justice Brandeis that a constitutional question should only be answered when necessary. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-348, 56 S.Ct. 466, 482, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Our conclusion that the OHSAA rule violates 45 C.F.R. § 86.41 makes it unnecessary to decide whether the rule also violates the fourteenth amendment
 
 
 [4]
 Contrary to the dissent's assertion, what follows is not dictum. The District Court ruled that 45 C.F.R. § 86.41 is unconstitutional. We are reversing that ruling and explaining our decision
 
 
 [1]
 The full text of Senator Bayh's statement is:
 The rulemaking powers referred to earlier, I think, give the secretary (of HEW) discretion to take care of this particular policy problem. I do not read this as requiring integration of dormitories between the sexes, nor do I feel it mandates the desegregation of football fields. What we are trying to do is provide equal access for women and men students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved. We are not requiring that intercollegiate football be desegregated, nor that the men's locker room be desegregated.
 
 
 [117]
 Cong.Rec.S. 30407 (August 6, 1971). For a more comprehensive discussion of the legislative history of Title IX, see Comment, Title IX's Promise of Equality of Opportunity in Athletics: Does It Cover the Bases?, 64 Ky.L.J. 432, 450-53 (1975)
 
 
 [2]
 Even if Title IX does apply to contact sports programs, the constitutional principles must be addressed in order to give meaning to the phrase "be excluded from participation in, be denied the benefits of, or be subjected to discrimination." See Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). This phrase could be interpreted on its face to allow separate teams for contact sports within an overall athletic program providing equal opportunity to women. In other words, the statute could be construed to require the equal "participation" of women and men, but not on the same teams. The critical term then is "discrimination." Whether the fielding of separate but equal teams is "discrimination" turns on an analysis of equal protection principles
 
 
 [3]
 This decision used the rational relationship test established in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). This test was subsequently modified and is no longer applicable. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Therefore, I question the strength of this presumption
 
 
 [4]
 My discussion of the equal protection cases is not meant to be exhaustive. Earlier cases concerning alleged sex discrimination in athletics are not discussed, because of the heightened level of scrutiny mandated by Craig v. Boren. E. g., Bucha v. Illinois School Ass'n, 351 F.Supp. 69 (N.D.Ill.1972)
 
 
 [5]
 Though I would leave the safety justification open to proof in a subsequent case, I believe that defendants will be hard-pressed ever to prove this rationale. Every athlete must accept the risk of injury. The goal of safety strikes me as another example of patronizing protection for women. As Mr. Justice Brennan has observed, such "romantic paternalism" has the "practical effect" of putting women "not on a pedestal, but in a cage." Frontiero v. Richardson, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973). Furthermore, there is no evidence that less restrictive alternatives to total exclusion were even considered
 
 
 [6]
 I must also note that the majority's discussion of these issues is purely dictum, as it is totally unnecessary to their resolution of the case. Also the majority indulges in speculative comments outside the facts or record presented
 
 
 [7]
 Defendants have not met their burden of justifying the OHSAA rule and their reliance on unsubstantiated speculation cannot suffice to defeat plaintiffs' prima facie case of discrimination. Douglas v. Hampton, 512 F.2d 976 (D.C. Cir. 1975)
 
 
 [8]
 Since I would hold that equal opportunity has not been provided, Vorchheimer v. School District of Philadelphia, 532 F.2d 880 (3d Cir. 1976), aff'd by equally divided court, 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 758 (1977) (per curiam), is distinguishable. Vorchheimer held that the equal protection clause and Title IX did not prohibit a school district from denying a female student admission to an all-male high school for exceptional students, when she could attend an equal all-female high school. The holding was premised on three findings of fact, which do not pertain in our case: 1) a separate-sex school has proven educational value; 2) plaintiff did not establish any injury, beyond a simple rejection of her preference; and 3) a long history established the equality of the two high schools in quality, academic standing, and prestige. Therefore, the majority in Vorchheimer concluded that the plaintiff had not been deprived of a benefit which could not have been obtained elsewhere. I have reached the opposite conclusion upon consideration of the facts in our case. Moreover, Judge Gibbon's powerful dissent in Vorchheimer and the equal division of the Supreme Court make suspect the precedential force of Vorchheimer
 
 
 [9]
 As was stated in Comment, supra at 448-49:
 Segregation of activity has the virtue of preserving opportunities for the majority of women, but it fails to accommodate the exceptional female athlete who would rather compete against men. If relegated to a sex-separated team, it is arguable that she will encounter less competition and receive less training than her ability deserves. Separate but equal has generally been proven to be separate and unequal in athletics. (footnote deleted).
 
 
 [10]
 Defendants argue strongly that this finding is clearly erroneous. I do not address this question, since its resolution would not change my conclusions
 
 
 [11]
 Recall that the vast majority of OHSAA members are public schools and that the OHSAA Board of Control is composed of representatives from the member schools
 
 
 [1]
 Ellen W. Gerber, Jan Felshin, Pearl Berlin, and Waneen Wyrick, The American Woman in Sport (Reading, Mass.: Addison-Wesley Publishing Company, Inc., 1974), p. 4
 
 
 [2]
 Betty Spears, "The Emergence of Women in Sport," Women's Athletics: Coping with Controversy (Washington, D.C.: AAHPER Publications, 1974), p. 27
 
 
 [3]
 Gerber, et al., The American Woman in Sport, p. 10
 
 
 [4]
 Spears, "The Emergence of Women in Sports," p. 27
 
 
 [5]
 Ibid
 
 
 [6]
 Ibid
 
 
 [7]
 Gerber, et al., The American Woman in Sport, p. 4
 
 
 [8]
 Spears, "The Emergence of Women in Sport," pp. 27-28. At Oberlin, the first coeducational college in the United States, both women and men participated in physical activity. Initially, activities for women included gardening as well as various kinds of household work, but beginning in the 1850s sports replaced labor as the required physical component in the education of men and women. Interestingly, the athletic program at Oberlin was first developed by a woman, Delphine Hanna. Frederick D. Shults, "Oberlin College: Molder of Four Great Men," Quest, Monograph XI, December 1968, p. 72
 
 
 [9]
 Betty Spears, "Prologue: The Myth," Women and Sport from Myth to Reality, ed. Carol A. Oglesby (Philadelphia, Pa.: Lea and Febiger, 1978), p. 9
 
 
 [10]
 Gymnastic exercises are the same as physical exercises or calisthenics
 
 
 [11]
 Spears, "Prologue: The Myth," p. 9
 
 
 [12]
 Ibid
 
 
 [13]
 Ibid., p. 10
 
 
 [14]
 Gerber et al., The American Woman in Sport, p. 68
 
 
 [15]
 Ibid., p. 16
 
 
 [16]
 Mabel Lee, "The Case For and Against Intercollegiate Athletics for Women and the Situation as it Stands To-Day," American Physical Education Review, vol. 29, January 1924, p. 13
 
 
 [17]
 Gerber et al., The American Woman in Sport, p. 16
 
 
 [18]
 Ibid., p. 69
 
 
 [19]
 Ibid
 
 
 [20]
 Spears, "Prologue: The Myth," p. 11
 
 
 [21]
 Margaret A. Coffey, "The Modern Sportswoman," Journal of Health, Physical Education and Recreation, vol. 36, February 1965, p. 39
 
 
 [22]
 Spears, "Prologue: The Myth," p. 11
 
 
 [23]
 Ibid
 
 
 [24]
 Richard A. Swanson, "From Glide to Stride: Significant Events in a Century of American Women's Sports," Women's Athletics: Coping with Controversy, pp. 48-49
 
 
 [25]
 Spears, "Prologue: The Myth," p. 11
 
 
 [26]
 Ibid., p. 12
 
 
 [27]
 Gerber, et al., The American Woman in Sport, p. 73
 
 
 [28]
 Mabel Lee, "The Case For and Against Intercollegiate Athletics for Women and the Situation Since 1923," Research Quarterly, vol. 11, May 1931, p. 122
 
 
 [29]
 Spears, "Prologue: The Myth," p. 13
 
 
 [30]
 Ibid
 
 
 [31]
 Gerber et al., The American Woman in Sport, p. 121
 
 
 [32]
 Ibid., pp. 133 and 302
 
 
 [33]
 DGWS is a division of the American Association for Health, Physical Education and Recreation
 
 
 [34]
 Lucille Magnusson, "The Development of Programs," Women's Athletics: Coping with Controversy, p. 56
 
 
 [35]
 Spears, "Prologue: The Myth," p. 14
 
 
 [36]
 20 U.S. § 1681 (1978)
 
 
 [37]
 45 C.F.R. § 86.41 (1978)
 38 U.S., Department of Health, Education, and Welfare, Office for Civil Rights, "Elimination of Sex Discrimination in Athletic Programs," memorandum to Chief State School Officers, Superintendents of Local Education Agencies, and College and University Presidents, September 1975.
 
 
 [39]
 "Hooping It Up Big," Time, Mar. 28, 1977, p. 84
 
 
 [40]
 Swanson, "From Glide to Stride," pp. 51-52
 
 
 [41]
 Jack H. Wilmore, "Physiological Principles and Practices of the Conditioning Process," Athletic Training and Physical Fitness (Boston, Mass.: Allyn and Bacon, Inc., 1977), p. 187
 
 
 [42]
 Jack H. Wilmore, "Exploding the Myth of Female Inferiority," The Physician and Sportsmedicine, vol. 2 (May 1974), p. 55
 
 
 [43]
 Gerber, et al., The American Woman in Sport, p. 427
 
 
 [44]
 Ibid., p. 428
 
 
 [45]
 N. V. Zimkin, Physiological Basis of Physical Culture and Sports (Moscow: Fizkultura i Sport, 1955), as cited in Gerber et al., The American Women in Sport, p. 428
 
 
 [46]
 E. S. Gendel, "Fitness and Fatigue in the Female," Journal of Health, Physical Education, and Recreation, vol. 42, October 1971, pp. 53-58
 
 
 [47]
 Gerber, The American Woman in Sport, p. 512
 
 
 [48]
 Gendel, "Fitness and Fatigue in the Female," p. 53
 
 
 [49]
 Jim Enright, Only in Iowa: Where the High School Girl Athlete is Queen (Des Moines: Iowa Girls High School Athletic Union, 1976)
 
 
 [50]
 See table A.1 in appendix A
 
 
 [51]
 American Friends Service Committee, "Almost as Fairly: The First Year of Title IX Implementation in Six Southern States," 1977, p. 46
 
 
 [52]
 Ibid., p. 49
 
 
 [53]
 Ibid., p. 46
 
 
 [54]
 Ibid., p. 53
 
 
 [55]
 "Revolution in Women's Sports," womenSports, September 1974, p. 37